**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SHANE DAWSON,
              *Plaintiff-Appellant,*

              v.

ENTEK INTERNATIONAL,
              *Defendant-Appellee.*

No. 09-35844
D.C. No.
08-cv-06151-AA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ann Aiken, District Judge, Presiding

Argued and Submitted
November 1, 2010—Portland, Oregon

Filed January 10, 2011

Before: William A. Fletcher and Raymond C. Fisher,
Circuit Judges, and David C. Bury, District Judge.*

Opinion by Judge Bury

---

*The Honorable David C. Bury, District Judge, United States District
Court for the District of Arizona, sitting by designation.

## COUNSEL

Kevin T. Lafky and Haley Percell, Lafkey and Lafkey, Salem, Oregon, for the plaintiff-appellant.

Patricia K. Runkles-Pearson and Dennis Westlind, Stoel Rives LLP, Portland, Oregon, for the defendant-appellee.

## OPINION

BURY, District Judge:

## OVERVIEW

Shane Dawson (Dawson), a male homosexual, appeals the district court's grant of summary judgment in favor of his former employer, Entek International (Entek), on claims of discrimination arising from his termination. Entek is an Oregon-based company that manufactures polyethylene battery separators.

On appeal, Dawson argues that the district court erred when it applied the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework to analyze state claims under Or. Rev. Stat. § 659A.030 for retaliatory discharge, sex hostile work environment, and sexual orientation hostile work environment. Dawson also claims that the district court erred when it granted summary judgment in Entek's favor on Dawson's claims of retaliatory discharge and sex hostile work environment under both Title VII and Or. Rev. Stat. § 659A.030, as well as sexual orientation hostile work environment under Or. Rev. Stat. § 659A.030. Finally, Dawson alleges that the district court erred when it granted summary judgment against Dawson on his claim of intentional infliction of emotional distress.

Viewing the evidence in the light most favorable to the nonmoving party, Dawson produced circumstantial evidence of retaliatory discharge and sexual orientation hostile work environment, such that resolution of this action by summary judgment was error. We reverse and remand.

## BACKGROUND

On April 13, 2007, Dawson was hired by Entek as a temporary production line worker. His job was to run a production

line that rolled up battery separators. Dawson worked with 24 other employees, all male. Production line workers generally worked three 12 hour shifts and then one 6 hour shift, rotating days and graveyard shifts. Dawson had two acquaintances who already worked at Entek, Josh Dobbs (Dobbs) and Travis Etherington (Etherington), who were aware of Dawson's sexual orientation. Dobbs and Etherington frequented the same bar as Dawson and his partner, Tracy Hubbard. Jeremy Seibert (Seibert), Dobbs, and Etherington all worked the graveyard shift on the line with Dawson as co-workers, not as supervisors or trainers.

One of Dawson's supervisors was Ken Haase (Haase), and his direct trainer was Troy Guzon (Guzon). Dawson did not see Haase that often, as he was one of the many supervisors. Guzon directly worked with Dawson "side-by-side" teaching him how to "run the line at Entek." Dawson considered Guzon not only his trainer but his supervisor; Guzon was the only supervisor that he dealt with on a daily basis, as Dawson explained: "Well, my direct trainer, who was Troy [Guzon], I was told to go to with any problems or questions that I had, because he was another one of the supervisors as far as I knew, so — and I never really dealt with any of the other — the other supervisors at all." Oakley Elliott (Elliott) hired Dawson; he was a forklift trainer but he generally worked the dayshift while Dawson worked the graveyard shift. Dawson was also aware that Rob Shimmin (Shimmin) was a supervisor and production manager, but they did not work the same shift.

At work, certain individuals began making derogatory comments about Dawson's sexual orientation. Dawson specifically stated that Dobbs, Seibert and Guzon made derogatory comments about his sexual orientation to Dawson directly and to others that Dawson overheard. Dobbs made the statement that Dawson was a "worthless queer." Dawson testified, "I was standing at my line, and [Dobbs] was standing at the line beside me with Jeremy and a few of the other guys when

[Dobbs] said that. . . . [Guzon] . . . was present and one of the other line operators . . . ." Dawson also overheard Dobbs tell others that Dawson liked to "suck dick" and "take it up the ass." Seibert referred to Dawson as "Tinker Bell," "a homo, a fag, and a queer" "on a daily basis for about a week, week and a half," and "acted in a physically intimidating manner." Dawson asked Seibert to stop using those words, but he would only stop for a couple of days and then start back up again. Dawson did not hear Seibert or Dobbs refer to any other co-workers in this way.

Guzon was present when these words were directed at Dawson, "[b]ecause [Guzon] was side by side with [Dawson] as [his] trainer and he was right there more than a few times when [Seibert] came over and said that. He was standing right there." Dawson went to Guzon and spoke with him about Seibert and others referring to him as "a homo and a fag" and "asked him if he could see if he could do something about it." Guzon said he would talk to Seibert about it. After their discussion, Guzon himself used the word "homo" 3-4 times when referring to Dawson. Shimmin and Haase, managers/supervisors, testified to overhearing other employees using the term "homo" over the years, but did not take it seriously.

Dawson began experiencing stress and work deterioration from the derogatory comments. On May 19, 2007, Dawson took a day off from work in response to the stress from his negative work environment. Dawson called the general number and asked the person who answered the phone to let his supervisor know that he was taking the day off. Entek recorded Dawson's day off as a "no-show/no-call day." Entek's procedure for an unscheduled absence required that the employees call one hour prior to the start of their shift and report their absence to a supervisor or designee. Dawson's call did not comply with this procedure.

The next day Dawson visited a person in human resources, Susan Morch (Morch). Dawson explained he had a problem

and needed to file some type of complaint due to the names he was being called, "a homo and a fag and . . . a queer." He told Morch that Seibert, Dobbs and Guzon had all used those words referring to him.

Two days later, on May 22, 2007, Dawson was terminated from employment, ostensibly because of his failure to call properly before missing work. As Dawson explained:

> I was told that I was being terminated for missing a shift, for a no-call/no-show. And I had explained that I did call in, but they said that I didn't call in. And then I explained to them — we also discussed what was talked about the day before, as to why I missed my shift, and I was told by Oakley and by Margaret [Campbell Rivers (Rivers) of Human Resources] that we have two different situations here and that therefore you're being terminated [from] your employment — for your attendance and then that we will deal with the other situation.

Entek reports that it investigated Dawson's complaints after his termination.

## STANDARD OF REVIEW

This court reviews a district court's grant of summary judgment de novo. *See, e.g.*, *Metoyer v. Chassman*, 504 F.3d 919, 930 (9th Cir. 2007); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

## DISCUSSION

**I. The district court did not err in concluding that the *McDonnell Douglas* burden-shifting framework applies when analyzing claims under Or. Rev. Stat. § 659A.030.**

Dawson's position is that the district court erred when it applied the *McDonnell Douglas* burden-shifting analysis to his supplemental state statutory claims and asks that the district court order granting summary judgment on the state statutory claims be reversed. Dawson bases his argument on previous Ninth Circuit law declining to apply the burden-shifting framework to Or. Rev. Stat. § 659A.030 on summary judgment. *See Messick v. Horizon Indus., Inc.*, 62 F.3d 1227, 1232 (9th Cir. 1995). Dawson argues under *Messick* that because he established a prima facie case of discrimination under the state statute, his case survives a summary judgment motion. Dawson argues further that the district court erred when it relied on *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080 (9th Cir. 2001) to support its use of the burden-shifting framework, because that was a diversity jurisdiction case. *Snead* held that, "when entertaining motions for summary judgment in employment discrimination cases arising under state law, federal courts sitting in diversity must apply the *McDonnell Douglas* burden-shifting scheme as a federal procedural rule." 237 F.3d at 1094.

Entek contends that the district court properly applied the burden shifting framework to find no state claim of discrimination in the workplace because *Snead* applies to state-law claims in federal court whatever the basis for subject matter jurisdiction. Dawson maintains that *Snead* does not apply to state law claims based on supplemental jurisdiction, as opposed to diversity jurisdiction. To support this position, Dawson relies on a number of unpublished decisions of Oregon district courts.

**[1]** The burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-04 (1973), is as follows:

> [t]he employee must first establish a prima facie case of discrimination. If he does, the employer must articulate a legitimate, nondiscriminatory reason for the challenged action. Finally, if the employer satisfies this burden, the employee must show that the reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (internal quotation marks and citations omitted).

Or. Rev. Stat. § 659A.030 reads, in pertinent part:

> (1) It is an unlawful employment practice:

> (a) For an employer, because of an individual's race, color, religion, sex, sexual orientation, national origin, marital status or age if the individual is 18 years of age or older, or because of the race, color, religion, sex, sexual orientation, national origin, marital status or age of any other person with whom the individual associates, or because of an individual's juvenile record that has been expunged pursuant to ORS 419A.260 and 419A.262, to refuse to hire or employ the individual or to bar or discharge the individual from employment. However, discrimination is not an unlawful employment practice if the discrimination results from a bona fide occupational qualification reasonably necessary to the normal operation of the employer's business.

> (b) For an employer, because of an individual's race, color, religion, sex, sexual orientation, national ori-

gin, marital status or age if the individual is 18 years of age or older, or because of the race, color, religion, sex, sexual orientation, national origin, marital status or age of any other person with whom the individual associates, or because of an individual's juvenile record that has been expunged pursuant to ORS 419A.260 and 419A.262, to discriminate against the individual in compensation or in terms, conditions or privileges of employment.

* * *

(f) For any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so.

(g) For any person, whether an employer or an employee, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so.

**[2]** The district court found that "[b]ecause the Oregon Revised Statutes § 659A.030 was modeled after Title VII, plaintiff's state and federal gender discrimination claims can be analyzed together." *Dawson v. Entek Int'l*, 662 F. Supp. 2d 1277, 1284 (D. Or. 2009). The district court relied on *Snead* when it employed the burden-shifting framework. *Snead* represents the law of this circuit and applies in all cases in federal district court in which the choice between federal and state procedural law is presented. The answer to the question whether federal procedural law must be applied is the same regardless of the source of the federal court's subject matter jurisdiction over a claim. *See In re Exxon Valdez*, 484 F.3d 1098, 1100 (9th Cir. 2007) ("'The *Erie* principles apply equally in the context of pendent jurisdiction.' . . . [T]he basis

of a federal court's jurisdiction over a state law claim is irrelevant for *Erie* purposes." (quoting *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995)). Accordingly, *Snead* directly controls this case, and dictates that the burden-shifting framework applies to all of Dawson's federal and state discrimination claims.

## II. The district court erred in granting summary judgment on Dawson's claims for retaliation under Title VII and Or. Rev. Stat. § 659A.030.

Dawson contends that the district court erred "when it concluded that Plaintiff had not offered any evidence of pretext to rebut Entek's proffered legitimate reason for terminating Plaintiff's employment." Dawson relies on *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007), to argue that not only did he raise evidence of pretext to rebut Entek's proffered legitimate reason for termination, but he has produced sufficient circumstantial evidence to raise a material question of fact on pretext. Dawson maintains that the timing of his discharge in relation to his report to Morch in human resources and complaint to his supervisor Guzon is sufficient to raise "indirect evidence that undermines the credibility of the employer's articulated reasons." *Id.* at 1171.

**[3]** Title VII prohibits an employer from discriminating against an employee for opposing an unlawful employment practice, such as filing a complaint alleging sexual orientation harassment and hostile work environment. Retaliatory discharge claims follow the same burden-shifting framework described in *McDonnell Douglas*. To establish a prima facie case, the employee must show that he engaged in a protected activity, he was subsequently subjected to an adverse employment action, and that a causal link exists between the two. *See Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988). The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the

adverse action. *Id.* If a plaintiff establishes a prima facie case of unlawful retaliation, the burden shifts to the defendant employer to offer evidence that the challenged action was taken for legitimate, non-discriminatory reasons. *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1996). If the employer provides a legitimate explanation for the challenged decision, the plaintiff must show that the defendant's explanation is merely a pretext for impermissible discrimination. *See Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).

The prima facie case under Or. Rev. Stat. § 659A.030 is similar. A plaintiff must prove that: 1) the defendant intentionally retaliated against the employee because he or she filed a discrimination complaint; 2) the defendant did so with the intent of forcing the employee to leave the employment; and 3) the employee left the employment as a result of the retaliation. *See Seitz v. Albina Human Res. Ctr.*, 100 Or. App. 665, 674-75 (Or. App. 1990).

**[4]** In order to establish his unlawful retaliation claim, Dawson must show the existence of facts from which a reasonable trier of fact could conclude that sometime during his short employment, he engaged in protected activity and that his employer, Entek, retaliated against him in response to that activity. There exists circumstantial evidence such that if believed by a trier of fact, Dawson could prevail on this claim. Futhermore, there is no legal precedent to support Entek's suggestion that a probationary or temporary employee is subject to a different or lower standard for purposes of proving discriminatory treatment than a permanent employee.

**[5]** Dawson engaged in protected activity when he visited Morch in human resources to discuss his treatment and file a complaint. This was a complaint to human resources staff based directly on sexual orientation discrimination. Less than 48 hours later, he was terminated from employment. Dawson had already addressed Guzon earlier in his employment about

the sexual orientation discrimination he was experiencing. Because Guzon was Dawson's trainer and immediate manager, there is evidence from which a fact-finder may conclude that Guzon was Dawson's supervisor. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1119 n.13 (9th Cir. 2004). Unqualifiedly, Dawson's discussion with Morch was a human resources contact with reference to his treatment. Entek's explanation for the discharge was the failure to comply with the no-show/no-call policy, but the timing of the two events, particularly because Dawson explained that it was the stress of his ongoing treatment at work that led to his absence, may or may not have been coincidental.

**[6]** We have previously recognized that "proximity in time between the protected action and the allegedly retaliatory employment decision [i]s one [way] a jury logically could infer [that the plaintiff] was terminated in retaliation." *See Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751-52 (9th Cir. 2001) (internal quotation marks omitted). In some cases, temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie case and the showing of pretext. *See Bell v. Clackamas County*, 341 F.3d 858, 865-66 (9th Cir. 2003); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731-32 (9th Cir. 1986).

**[7]** Viewing the facts in the light most favorable to Dawson, the protected activity occurred at most two days before the discharge and the treatment of Dawson was a topic during both the protected activity and the discharge, as explained by the supervisor and human resources person who fired him. The gravity of Dawson's complaints coupled with the time frame are such that a reasonable trier of fact could find in favor of Dawson on his retaliation claim. The district court erred in resolving this claim by summary judgment.

**III.   The district court did not err in granting summary judgment on Dawson's claims for sex hostile work environment under Title VII/Or. Rev. Stat. § 659A.303.**

Dawson argues that the district court erred when it concluded that his sex hostile work environment claims failed because he could not establish that the comments made by his co-workers were due to his gender. He argues that one way of satisfying the requirement that he prove the harassment was "because of [his] sex" is to inquire whether the harasser would have acted the same if the gender of the victim had been different. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998).

Entek asserts under the theory of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), and *Nichols v. Azteca Rest. Enter., Inc.*, 256 F.3d 864, 874-875 (9th Cir. 2001) that Dawson's sole basis for his hostile work environment gender discrimination claim is that he was harassed because he appeared effeminate. Entek argues that the district court properly dismissed those claims because Dawson presented no evidence that he failed to conform to a gender stereotype. Entek relies on Dawson's own testimony that he does not exhibit effeminate traits, and concludes he therefore failed to state a claim for sex hostile work environment. Entek also asserts the defense of prompt and appropriate action after Dawson was terminated from employment.

**[8]** A plaintiff may establish a sex hostile work environment claim by showing that he was subjected to verbal or physical harassment that was sexual in nature, that the harassment was unwelcome and that the harassment was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. *See Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir. 1998). A plaintiff must establish that the conduct at issue was both objectively and subjectively offensive: he must show that a

reasonable person would find the work environment to be "hostile or abusive," and that he in fact did perceive it to be so. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). Where an employee is allegedly harassed by co-workers, the employer may be liable if it knows or should know of the harassment but fails to take steps "reasonably calculated to end the harassment." *Nichols*, 256 F.3d at 875 (internal quotation marks omitted).

The district court analyzed Dawson's claim of hostile work environment sex discrimination by application of *Price Waterhouse*, 490 U.S. at 250. "There, the Supreme Court held that if an employer acts on the basis of belief that a female employee does not match a sex stereotype, the employee has an actionable claim under Title VII for discrimination based on sex." *Dawson*, 662 F. Supp. 2d at 1286. The district court went on to find that this holding applies to a man who does not fit the male stereotype by acting too feminine. *See id.* (citing *Nichols*, 256 F.3d at 874).

**[9]** The district court correctly found that based even on his own testimony Dawson was not being verbally harassed for appearing non-masculine or for otherwise not fitting the male stereotype. There do not appear to be sufficient facts to support a finding that a reasonable trier of fact could conclude that Dawson experienced a hostile work environment based on his gender.

**IV.    The district court erred in granting summary judgment on Dawson's claim for sexual orientation hostile work environment under Or. Rev. Stat. § 659A.030.**

Entek did not challenge the plaintiff's showing of a hostile work environment based on sexual orientation, but argued Entek was not liable for any harassment that took place. First, Entek argued that Or. Rev. Stat. § 659A.030 did not prohibit sexual orientation hostile work environment at the time of the

events at issue. Second, Entek argued it was not liable because its management had no notice of the harassment. The district court found that § 659A.030 did bar sexual orientation hostile work environment claims at the time, but concluded Entek was not liable because Guzon did not fall within the definition of a supervisor under *Lamb v. Household Credit Services*, 956 F. Supp. 1511 (N.D. Cal. 1997).

### A.  The district court did not err when it determined that Or. Rev. Stat. § 659A.030 prohibits sexual orientation discrimination.

Entek argues that Oregon's applicable statute did not encompass hostile work environment claims based on sexual orientation until after Dawson's discharge. Entek points out that Dawson's sexual orientation discrimination claim is based solely on the Oregon statute, not Title VII, and that the Oregon statute was not amended to add hostile work environment sexual orientation discrimination until January 1, 2008. Entek takes issue with the district court's reliance on *Tanner v. Oregon Health Sciences University*, 157 Or. App. 502 (Or. App. 1998), to find a viable claim for relief. Entek asks us to hold that the district court erred when it determined that Or. Rev. Stat. § 659A.030 prohibited sexual orientation discrimination before the amendments that took effect in January 2008.

**[10]** In 2007, Oregon amended its general anti-discrimination in employment statute to include "sexual orientation" among the prohibited grounds for discrimination. 2007 Or. Laws ch. 100 (effective January 1, 2008). At the time these events took place, however, the statute only provided that it was unlawful for an employer to discriminate "because of . . . sex . . . or because of the . . . sex . . . of any other person with whom the individual associates." Or. Rev. Stat. § 659A.030 (2007). *Tanner* held that "the only plausible construction of th[is] statutory language" is that it governs sexual orientation discrimination. 157 Or. App. at 524; *see*

*also Heller v. Columbia Edgewater Country Club*, 195 F. Supp. 2d 1212, 1222 (D. Or. 2002) ("O.R.S. § 659A.030 prohibits discrimination on the basis of an employee's sexual orientation."); *Am. Civil Liberties Union of Oregon, Inc. v. Roberts*, 305 Or. 522, 526-27 (1988) ("It is possible to construe some Oregon statutes as prohibiting discrimination based on sexual orientation."). Accordingly, we hold the district court did not err in concluding that sexual orientation hostile work environment was actionable at the time of the incidents at issue.

### B. The district court erred when it found on summary judgment that Entek was not liable for the sexual orientation hostile work environment.

**[11]** To prevail on the hostile work environment claim based on sexual orientation, Dawson is required to establish a pattern of ongoing and persistent harassment severe enough to alter the conditions of employment. *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108 (9th Cir. 1998); *Fred Meyer, Inc. v. Bureau of Labor & Indus.*, 152 Or. App. 302, 307 (Or. App. 1998). Dawson needed to produce evidence such that a reasonable trier of fact could conclude that his workplace was both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive and one that the victim did in fact perceive to be so. *Faragher*, 524 U.S. at 787. This harassment must be based on sexual orientation.

**[12]** When harassment by a supervisor is at issue, an employer is vicariously liable, subject to a potential affirmative defense. *See Nichols*, 256 F.3d at 877 (citing *Faragher*, 524 U.S. at 780). "If, however, the harasser is merely a coworker, the plaintiff must prove that . . . the employer knew or should have known of the harassment but did not take adequate steps to address it." *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001); *see also Nichols*, 256 F.3d at 875 (holding that when harassment by co-workers is at issue, the employer's conduct is reviewed for negligence).

Entek argues that Dawson presented no evidence that managers had any knowledge of Dawson's treatment. Evidence exists in the record that the company officially was put on notice of the hostile work environment when Dawson went to Morch and asked about filing a complaint, before he was terminated from employment. There is circumstantial evidence that Entek was put on notice when Dawson talked to Guzon about the treatment and Guzon not only ignored the complaint but joined in the derogatory name calling. There is evidence from which a fact-finder could conclude that Guzon was Dawson's supervisor.

## 1. Vicarious Liability for Acts by Supervisors

**[13]** Entek denies that Guzon was Dawson's supervisor. Ninth Circuit case law distinguishes between a situation in which a harasser supervises the plaintiff, where vicarious liability is available, versus a situation in which a harasser is a supervisor and yet does not supervise the plaintiff. *See Swinton*, 270 F.3d at 804-05. An employer is vicariously liable for actions by a supervisor who has "immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807. This distinction "is not dependent upon job titles or formal structures within the workplace, but rather upon whether a supervisor has the authority to demand obedience from an employee." *McGinest*, 360 F.3d at 1119 n.13. If Guzon engaged in supervision of or had authority over Dawson, he could be deemed by a trier of fact as Dawson's supervisor even if the company did not define his role this way. *See Swinton*, 270 F.3d at 803-05. The questions of who was considered a supervisor by Entek, and whether its job categories suffice to satisfy the demarcations drawn under the case law interpreting the Oregon statute, are properly resolved by the district court or the trier of fact on a more extensive factual record. *See McGinest*, 360 F.3d at 1119 n.13.

An employer may raise a two-pronged affirmative defense to avoid vicarious liability for a hostile environment created

by a supervisor. *See Nichols*, 256 F.3d at 877. The district court should reconsider whether Entek has made out the affirmative defense after resolving the disputed facts in this case. If, for example, Entek fired Dawson in retaliation for his protected complaint, it would be difficult to say that Entek had adequately addressed the problem of harassment of homosexual employees.

## 2. Liability for Actions by Coworkers

**[14]** " '[E]mployers are liable for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known.' " *Ellison*, 924 F.2d at 881 (quoting *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1515-16 (9th Cir. 1989)); *see also Swinton*, 270 F.3d at 803. Entek had actual knowledge of the events at least by the time Dawson informed Morch, in Human Resources, and even earlier if Guzon is found to be a supervisor. Entek arguably also had actual knowledge from Haase and Shimmin, who admitting to hearing "homo" being used over the years and not taking it seriously. The district court incorrectly relied on *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1187 (9th Cir. 2005), for the proposition that Dawson needed to explicitly tell Shimmin and Haase that he found the derogatory term "homo" offensive.

Entek may nonetheless avoid liability for such harassment if it undertook remedial measures "reasonably calculated to end the harassment." *Ellison*, 924 F.2d at 882 (internal quotation marks omitted); *see also Yamaguchi v. U.S. Dep't of the Air Force*, 109 F.3d 1475, 1482 (9th Cir. 1997). "The reasonableness of the remedy depends on its ability to: (1) 'stop harassment by the person who engaged in harassment;' and (2) 'persuade potential harassers to refrain from unlawful conduct.' " *Nichols*, 256 F.3d at 875 (quoting *Ellison*, 924 F.2d at 882). To be adequate, an employer must intervene promptly. *See Intlekofer v. Turnage*, 973 F.2d 773, 778 (9th

Cir. 1992). Remedial measures may include some form of disciplinary action, *see Yamaguchi*, 109 F.3d at 1482, "proportionate[ ] to the seriousness of the offense," *Ellison*, 924 F.2d at 882. "Title VII requires more than a mere request to refrain from discriminatory conduct." *Id.* (citation omitted).

Entek took action by firing Dawson and then offering some counseling and training sessions. Entek alleges that these remedial measures stopped the harassment, and were sufficient to protect it from liability. Entek did not discipline any employees or supervisors because, it contends, it decided that Dawson's reports were not credible. Inaction constitutes a ratification of past harassment, even if such harassment independently ceases. *See Nichols*, 256 F.3d at 875-76 ("When the employer undertakes no remedy, or where the remedy does not end the current harassment and deter future harassment, liability attaches for both the past harassment and any future harassment."); *Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir. 1995) (noting that Title VII condemns "the existence of past harassment, every bit as much as the risk of future harassment"). As stated above, the district court should reconsider whether the defense has been made out after resolving the disputed factual issues surrounding Dawson's firing.

**[15]** In sum, the district court erred by granting summary judgment for Entek on the claim of hostile work environment based on sexual orientation under the Oregon state statute.

## V. The district court not did err in granting summary judgment on Dawson's claim for intentional infliction of emotional distress.

Dawson argues that the district court erred when it ruled that a trier of fact could not conclude that the name calling and derogatory references to homosexuality transcended the boundaries of socially acceptable behavior by Entek. Dawson argues that whether actions involved constituted socially intolerable conduct amounting to intentional infliction of

emotional distress (IIED) is a fact question to be resolved on a case-by-case basis by the trier of fact considering the totality of the circumstances.

To prove a claim of intentional infliction of emotional distress under Oregon law, a plaintiff must establish: (1) the defendant intended to inflict severe emotional distress, (2) the acts were the cause of plaintiff's severe emotional distress, and (3) the acts were sufficiently grievous to constitute a transgression of the bounds of socially tolerable conduct. *See Delaney v. Clifton*, 180 Or. App. 119, 129-30 (Or. App. 2002). "The intent element of the claim does not require a malicious motive or a purposeful design to inflict emotional distress on the plaintiff; it is satisfied if a defendant either desires to inflict severe emotional distress, or knows that such distress is certain, or substantially certain, to result from his conduct." *Id.* at 132 (internal quotation marks omitted). "Whether the conduct alleged is sufficiently extreme or outrageous to be actionable is a fact-specific inquiry, one to be made on a case-by-case basis considering the totality of the circumstances." *Id.* at 130. "Whether conduct constitutes an extraordinary transgression of the bounds of socially tolerable conduct is a question of law." *Harris v. Pameco Corp.*, 170 Or. App. 164, 171 (Or. App. 2000).

**[16]** In the corporate context, a company's indifference to coworker harassment does not make out an IIED claim against the company. *See Wheeler v. Marathon Printing, Inc.*, 157 Or. App. 290, 307-08 (Or. App. 1998) (citing *Lewis v. Oregon Beauty Supply Co.*, 302 Or. 616, 627-28 (Or. 1987)). Thus, the district court correctly found that Dawson failed to legally state a claim for intentional infliction of emotional distress by Entek.

## CONCLUSION

Dawson provided sufficient circumstantial evidence to create a genuine issue of material fact on his claim of retalia-

tion. *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (discussing under what circumstances circumstantial evidence may show pretext). The record presents a triable issue whether Entek's proffered rationale for firing Dawson is "unworthy of credence." *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). The record also provides sufficient evidence to create a genuine issue of material fact concerning a hostile work environment based on sexual orientation.

Because Dawson has presented circumstantial evidence that a genuine issue of material fact exists regarding his claims of retaliation and sexual orientation hostile work environment, the decision of the district court is reversed on these claims and this matter is remanded to the district court for further proceedings.

REVERSED AND REMANDED.