**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

AUG 11 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ANGELA CUMMINGS, | No. 16-15369 |
| Plaintiff-Appellant, | |
| v. | D.C. No. 2:13-cv-00479-APG-GWF |
| VALLEY HEALTH SYSTEM, LLC, DBA Desert Springs Hospital; and RAEJOHNE FOSTER, | MEMORANDUM* |
| Defendants-Appellees. | |

Appeal from the United States District Court
for the District of Nevada
Andrew P. Gordon, District Judge, Presiding

Argued and Submitted June 5, 2017
Pasadena, California

Before: GRABER, SACK,** and MURGUIA, Circuit Judges.

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\** The Honorable Robert D. Sack, United States Circuit Judge for the Court of Appeals for the Second Circuit, sitting by designation.

Angela Cummings worked as a telemetry monitor technician at Valley Health System, LLC dba Desert Springs Hospital ("DSH") from 2005 until 2013. Throughout her tenure at DSH, Cummings had a hostile relationship with one of her co-workers, Raejohne Foster.

In May 2012 and June 2012, Cummings complained to DSH that Foster was harassing her in the workplace; DSH investigated but did not find sufficient evidence to take action. In July 2012, Cummings filed charges with the Nevada Equal Rights Commission and the Equal Employment Opportunity Commission, complaining of race and gender discrimination. On December 18, 2012, Cummings met with DSH's new Human Resources Director to complain about discrimination. On December 21, 2012, DSH issued three corrective actions against Cummings for several infractions she had committed in the prior month. These three corrective actions, combined with two issued earlier in the year, placed Cummings one violation away from termination under DSH's progressive discipline policy.

The final violation occurred on January 11, 2013, when DSH suspended Cummings pending an investigation into charges that she had been watching a video on the computer instead of monitoring the telemetry unit. On January 12, 2013, the DSH security office received a report from an employee named "Diane" in the telemetry unit, who stated that she had heard from "several employees" that

2

Cummings threatened to "shoot up the place" if she were terminated. Donna Adkins, a DSH supervisor, responded to this report by informing DSH employees that the security code to the door would be changed as a precaution against Cummings' purported threat. Adkins then initiated an investigation and determined that the reported threat was nothing more than a false rumor, but she could not identify the source of the rumor. Another DSH employee, Synthia Armstrong, checked the shift schedule for the telemetry unit on January 12, 2013, and determined that Foster was the other technician working with Diane that day.

On January 30, 2013, DSH held a meeting with Cummings to discuss her future with the company, but Cummings stormed out of the meeting before a resolution could be reached. DSH terminated Cummings' employment effective February 20, 2013. Cummings filed suit against DSH, alleging defamation, retaliation, and discharge in violation of public policy. She also sued Foster, alleging defamation and intentional interference with prospective economic advantage. The district court granted summary judgment in favor of DSH and Foster on all claims. We review the district court's grant of summary judgment de novo, *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1139–40 (9th Cir. 2002). We affirm in part, reverse in part, and remand.

3

**1.**     Cummings' defamation claim against DSH fails because Adkins' statement to DSH employees about Cummings' alleged threat was privileged. The intracorporate communication privilege applies to a statement involving "the regular course of the corporation's business," if the statement is made in good faith to a person with an interest in the subject matter of the statement. *Simpson v. Mars, Inc.*, 929 P.2d 966, 968 (Nev. 1997). Here, Adkins received a genuine report about Cummings' threat from the DSH security office, and she took precautions to protect DSH employees by informing them about the threat. No reasonable jury could find that Adkins lacked a good-faith belief in the statement or acted with malice.

**2.**     Cummings alleges that DSH retaliated against her in violation of Title VII, 42 U.S.C. § 1981, and Nevada Revised Statutes § 613.330. Each of these statutes is analyzed using the *McDonnell Douglas* framework. *See Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011) (Title VII retaliation claims are subject to the *McDonnell Douglas* framework); *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1104 (9th Cir. 2008) (Section 1981 claims are subject to the same standard as Title VII claims); *Apececge v. White Pine Cty.*, 615 P.2d 975, 977 (Nev. 1980) (Nev. Rev. Stat. § 613.330 claims are subject to the same standard as Title VII).

4

Even assuming that Cummings has established a prima facie case of retaliation at step one of the *McDonnell Douglas* analysis, DSH has met its burden at step two of the *McDonnell Douglas* framework by articulating a legitimate, non-retaliatory reason for terminating Cummings' employment. DSH fired Cummings in accordance with its progressive discipline policy after she had accrued six corrective actions. *See Unt v. Aerospace Corp.*, 765 F.2d 1440, 1446 (9th Cir. 1985) ("An employee is not protected by Title VII when he violates legitimate company rules, knowingly disobeys company orders, disrupts the work environment of his employer, or willfully interferes with the attainment of the employer's goals.").

Cummings has not shown pretext, as required at step three of the *McDonnell Douglas* analysis. Despite the close temporal proximity between Cummings' discrimination complaint to DSH on December 18, 2012, and the three corrective actions DSH issued on December 21, 2012, the surrounding circumstances do not show pretext. *See Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003) ("[T]here is no set time within which acts necessarily support an inference of retaliation. . . . [Retaliation] must be decided in the light of the timing and the surrounding circumstances."). First, each of the corrective actions that DSH issued to Cummings was based on an established company policy or practice. Next, DSH

5

was responsive to Cummings' complaints of harassment and provided Cummings with a summary of its investigations into her claims. Finally, DSH first discovered Cummings' video misconduct *after* Cummings had complained about discrimination; this new, intervening discovery undermines the causal inference. *See Curley v. City of N. Las Vegas*, 772 F.3d 629, 631 (9th Cir. 2014) ("[N]ew information revealed by [an intervening] investigation defeats any causal inference that might otherwise follow from the temporal proximity between . . . protected activity and . . . termination.").

3.      Cummings' claim alleging discharge in violation of public policy against DSH also fails because it is premised on the same legal theory and facts as her retaliation claim.

4.      Cummings' claim of intentional interference with prospective economic advantage against Foster fails because Cummings has not shown "actual harm . . . as a result of the defendant's conduct." *Leavitt v. Leisure Sports Incorporation*, 734 P.2d 1221, 1225 (Nev. 1987). A defendant is only liable to a plaintiff "for the pecuniary harm resulting from loss of the benefits of the [economic] relation." Restatement (Second) of Torts § 766B (1979). There is no evidence in the record showing that Cummings' economic relationship with DSH

was severed as a result of Foster's rumor; rather, DSH fired Cummings because of the corrective actions she received in 2012 and the investigation revealing that she had been watching a video during her shift monitoring the telemetry unit.

**5.** Finally, Cummings' defamation claim against Foster survives. To establish a defamation claim, a plaintiff must demonstrate (1) a false and defamatory statement of fact by the defendant; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages.[1] *Pope v. Motel 6*, 114 P.3d 277, 282 (Nev. 2005). The main issue on appeal is whether a triable issue of fact exists that Foster was the source of the defamatory statement about Cummings' threat to "shoot up the place."

Drawing all inferences in Cummings' favor, as we must at the summary judgment stage, we hold that there is enough circumstantial evidence from which a reasonable jury could conclude that Foster started the rumor. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) ("Summary judgment is

_____

[1] While a lack of actual damages defeats Cummings' intentional interference claim, it is not fatal to her defamation claim because damages are presumed where a plaintiff alleges slander per se. *Branda v. Sanford*, 637 P.2d 1223, 1225 (Nev. 1981). Under Nevada law, one category of slander per se includes statements "that the plaintiff committed a crime." *Nev. Indep. Broad. Corp. v. Allen*, 664 P.2d 337, 341 (Nev. 1983). Here, the alleged defamatory statement—that Cummings had threatened to "shoot up the place"—essentially accuses Cummings of making a criminal threat and, therefore, constitutes slander per se.

7

inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor."). First, the DSH security report indicated that the threat was reported by an employee named "Diane" in the telemetry unit. Next, Armstrong testified that on the day of the threat report, Foster and Diane worked together in the telemetry room, according to the shift schedule. Telemetry technicians work in pairs, meaning that the only two employees in the telemetry room that day were Foster and Diane. Finally, as Foster herself acknowledged in deposition testimony, she and Cummings have had a contentious history, and Foster has previously reported Cummings for several violations of company policy.

We also conclude that Foster is not covered by the intracorporate communication privilege. "[P]rivileges are defenses to a defamation claim and, therefore, the defendant has the initial burden of properly alleging the privilege and then of proving the allegations at trial." *Lubin v. Kunin*, 17 P.3d 422, 427 (Nev. 2001) (per curiam). Foster has not met this burden because there is no evidence that she made the statement in good faith. *See Circus Circus Hotels, Inc. v. Witherspoon*, 657 P.2d 101, 105 (Nev. 1983) (per curiam) ("A qualified or conditional privilege exists where a defamatory statement *is made in good faith . . . .*" (emphasis added)).

8

This is not to say that all cases involving rumors swirling around the workplace will survive to see a defamation trial. Absent direct evidence, a plaintiff must provide more than mere speculation or suspicion to create a triable issue of fact that one of her co-workers was the source of a defamatory statement. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978) ("[A] jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation."). The evidence here, however, presents a unique situation in which Foster—who harbored the most animus against Cummings and has actively targeted Cummings in the past—was the only other person in a room with Diane on the day that Diane reported that she heard about Cummings' threat of violence from fellow employees. On this record, we conclude that a triable issue of fact exists as to whether Foster originated the defamatory statement.

Therefore, we reverse the district court's grant of summary judgment on the defamation claim against Foster.

**AFFIRMED in part, REVERSED in part, and REMANDED**. The parties shall bear their own costs on appeal.

9



FILED

AUG 11 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

Sack,* Circuit Judge, dissenting in part:

A plaintiff brings a slander per se claim against a co-worker, and that claim is defeated on summary judgment. On review, an appellate court holds that the claim should have survived the defendant's motion for summary judgment notwithstanding that the plaintiff adduced no direct evidence even suggesting that the defendant made the allegedly defamatory statement: the defendant denied making it; the individual who reported the statement said that she heard it from "several" individuals without identifying the defendant as one of those multiple speakers; and no witness testified that the defendant was the source of the statement. That, as I see it, is the case at bar. Although I agree with the panel majority with respect to the remainder of this appeal, Memorandum Disposition (hereinafter "MD") at 4-7, I respectfully dissent from its decision to return the case to the district court for trial of the defamation claim brought against defendant-appellee Raejohne Foster.

The plaintiff-appellant, Angela Cummings, was employed as a telemetry monitor technician at and by Valley Health System, LLC dba Desert Springs Hospital ("DSH") between 2005 and 2013. Declaration of Angela Cummings

---

* The Honorable Robert D. Sack, United States Circuit Judge for the Court of Appeals for the Second Circuit, sitting by designation.

1

(hereinafter "Cummings Dec.") ¶ 7, Excerpts of the Record (hereinafter "ER") Vol. II at 38. Telemetry monitor technicians work in a small space in teams of two, tracking dozens of panels that receive and display diagnostic information about patients' heart health. Deposition of Angela Cummings (hereinafter "Cummings Dep.") at 59-60, ER Vol. III at 16-17. Throughout her nearly eight-year tenure at DSH, Cummings was repeatedly issued "corrective actions"[1] and citations related to various workplace infractions. In 2011, for example, she was cited for being "very rude" toward a co-worker. DSH Corrective Action Report (Oct. 19, 2011), ER Vol. III at 151. In 2012, she was disciplined for violating DSH's timekeeping policies. DSH Corrective Action Report (July 28, 2012), ER Vol. III at 166. The same year, a co-worker reported that Cummings failed to report to the telemetry monitor room at the start of her shift, and when she did arrive she was "very rude, abrupt and insubordinate." Ltr. from Beena Thomas to Jim Zolnowski (July 28, 2012), ER Vol. III at 196. It appears that Cummings occasionally clashed with her co-workers. Her 2007 performance review states that while Cummings "is a good monitor tech[nician] . . . [,] she need[s] to be considerate of her coworkers. She does not consistently communicate with her peers." Cummings Dep. at 65, ER Vol. III at 22.

---

[1] A "corrective action" is a DSH term for a plan to identify and rectify improper employee behavior.

In particular, Cummings had several disputes with the defendant-appellee, Raejohne Foster, who was employed as a telemetry monitor technician by and at DSH between 2004 and 2014. Deposition of Raejohne Foster (hereinafter "Foster Dep.") at 20, ER Vol. II at 123. In 2012, for example, Cummings reported that Foster had engaged in "repeated threats of violence, harassment and humiliation" against her dating back to 2010. Ltr. from Angela Cummings to DSH Human Resources (May 7, 2012), ER Vol. III at 153. DSH investigated but was unable to substantiate those allegations. DSH Human Resources Memorandum (June 5, 2012), ER Vol. III at 157. Foster conceded, however, that the two did not get along. *See* Foster Dep. at 23-24, ER Vol. II at 125. She recounted one incident, for example, when Cummings reported Foster for watching an internet video when Foster should have been monitoring telemetry panels. *Id.* at 31-32, ER Vol. II at 127. Foster estimated that, for her part, she reported Cummings for workplace infractions on five occasions. *Id.* at 37, ER Vol. II at 129.

The events at issue in this litigation relate to a particular series of disputes in late 2012 and early 2013. On or about December 1, 2012, Cummings was staffed to the telemetry monitor room with Joanne Ruiz, another telemetry monitor technician. Cummings Dec. ¶ 43, ER Vol. II at 43. During the Cummings-Ruiz shift, Foster entered the telemetry monitor room to converse with Ruiz and saw that Cummings was watching a video instead of the telemetry monitors. *Id.* Foster

3

created a video recording of the incident—which was provided to DSH—and reported Cummings to her superiors. As a result of Foster sharing that information with management, on January 11, 2013, Cummings was placed on "investigative leave." DSH Corrective Action Report (Jan. 11, 2013), ER Vol. III at 220.

The next day, January 12, another DSH employee, identified in the record only as "Diane," reported to the DSH Security Department that "[s]he heard from several employees that [Cummings] . . . had made a comment that if she gets fired she would come back and shoot up the place." DSH Incident Report (Jan. 12, 2013), ER Vol. III at 222.[2] Nothing in the record—other than the rumors themselves—supports the assertion that Cummings made such a threat. In fact, according to Donna Adkins, then interim director of DSH critical care, Diane later indicated that she meant only to pose a "what if" scenario. E-mail from Donna Adkins to Yomi Fabiyi (Jan. 15, 2013), ER Vol. III at 224. Nonetheless, "as an extra measure," Adkins "change[d] the security door code to the [telemetry monitor] room." *Id*.

---

[2] The only recordation of Diane's statement is in an "incident report" that recounts Diane's statement to the DSH Security Department regarding "threatening comments" attributed to Cummings in the incident report. DSH Incident Report (Jan. 12, 2013), ER Vol. III at 222. Diane's deposition was not taken in connection with this litigation or the events underlying it.

4

More than a month later, on February 20, 2013, Cummings' employment was terminated because she had repeatedly violated DSH policies. Ltr. from Yomi Fabiyi to Angela Cummings (Feb. 20, 2013), ER Vol. III at 238. Her termination was unrelated to the alleged threatening statement attributed to her. Cummings eventually filed a lawsuit against DSH and Foster, alleging, *inter alia*, that Foster defamed her by conveying to Diane the rumor that Cummings had threatened to "shoot up the place." Compl. ¶¶ 72-84, ER Vol. II at 30-31. The United States District Court for the District of Nevada (Gordon, *Judge*) granted the defendants' motion for summary judgment on all claims, deciding with respect to the slander per se claim that recovery was barred by the intracorporate communication privilege.

I agree with the majority—although not without some reluctance, as explained below—that "Foster is not covered by the intracorporate communication privilege." MD at 8. I do not agree, however, that Cummings adduced "enough circumstantial evidence from which a reasonable jury could conclude that Foster started the rumor." *Id.* at 7. "[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996). And "[a] mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence

5

is reasonably susceptible; it may not resort to speculation." *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978).

"A defamation claim requires demonstrating (1) a false and defamatory statement of fact *by the defendant* concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Pope v. Motel 6*, 114 P.3d 277, 282, 121 Nev. 307, 315 (Nev. 2005) (emphasis added)). Cummings presented no more than a "mere scintilla of evidence" supporting the notion that Foster made the allegedly defamatory statement reported by Diane. This evidence would, in my view, permit a reasonable jury to do little more than speculate that Foster made the allegedly defamatory statement. I would therefore affirm that part of the district court's judgment granting Foster's motion for summary judgment on the slander per se claim, albeit on different grounds from those employed by the district court.

No direct evidence links Foster to the allegedly defamatory statement. During her deposition, and while under oath, Foster herself denied spreading the rumor. Foster Dep. at 62-62, ER Vol. II at 135. The DSH incident report, the sole source for the parties' assertions concerning Diane's statement about the alleged rumor, indicates that Diane heard the rumor from "several employees," but does not identify Foster as one of them. DSH Incident Report (Jan. 12, 2013), ER Vol. III at 222. Thus, the lone piece of direct evidence in this case as to the propagation

6

of the rumor identified neither Foster nor any other particular employee as the speaker.  A third employee stated in her sworn deposition that although she "*assumed*" that Foster spread the allegedly defamatory rumor, the employee "[did not] *know* if [Foster] did" in fact do so.  Deposition of Synthia Armstrong at 53, ER Vol. II at 64 (emphases added).  Indeed, of the many DSH employees, supervisors, and officers deposed in this case (Diane not among them), no one testified that Foster made the allegedly defamatory statement.

The majority nonetheless concludes that that "there is enough circumstantial evidence" connecting Foster to the allegedly defamatory statement on two grounds.  MD at 7.  First, the majority notes that Foster and Diane "worked together in the telemetry room" on January 12, 2013, the day Diane reported Cummings to the DSH security department.  *Id.* at 8.  I do not think that circumstance permits the inference—let alone supports the conclusion—that Diane heard the allegedly defamatory rumor about Cummings from Foster.  Although it is *possible* that Foster told Diane the rumor while the two were together in the telemetry monitor room, it is also possible that Diane—whose testimony as to these events was never taken—heard the rumor while talking to a co-worker outside work, or while chatting on the phone in her car, or while texting from her living room.  The possibilities are virtually endless.  Some of these manifold possibilities seem to me to be at least as likely as the inference drawn by the majority, in no small part

7

because Diane, we are told, reported hearing the rumor from "several employees." DSH Incident Report (Jan. 12, 2013), ER Vol. III at 222. Moreover, when Diane reported the alleged threat on January 12, 2013, the day she was working with Foster, she apparently did not state that she first heard the rumor that day. Perhaps she instead heard the rumor the day before, when Cummings was placed on investigative leave, and decided only the next day to raise the issue. We do not know.

The majority further states that because Diane and Foster were the only telemetry monitor technicians assigned to the telemetry monitor room on January 12, 2013, they were "the only two employees in the telemetry room" on the day that Diane filed her report. MD at 8. I do not think that the record supports that inference. DSH employees were, more or less freely, permitted to enter and exit the telemetry room. DSH nurses delivered equipment to the telemetry room and would have had an opportunity to engage with the monitor technicians. *Id.* at 75, ER Vol. III at 30. And, of course, Cummings was ultimately terminated because Foster entered the telemetry monitor room to converse with Ruiz on a day that she was not staffed to that room, and in the process she saw Cummings failing to attend to the monitors. Cummings Dec. ¶ 21, ER Vol. II at 43. Moreover, telemetry monitor technicians were given multiple meal and restroom breaks throughout the day, during which they very likely interacted with other employees.

8

Cummings Dep. at 115-18, ER Vol. III at 40-43. Thus, I do not think that a reasonable juror could conclude either that Diane necessarily interacted with only Foster on the day that Diane reported the Cummings rumor, or that Foster was the source of the allegedly defamatory statement based on this evidence.

Second, the majority reasons that the slander per se claim brought against Foster should survive summary judgment because "[Foster] and Cummings have had a contentious history." MD at 8. That description of their relationship is surely accurate. But to infer from that and Foster's history of "report[ing] Cummings for several violations of company policy" that Foster spread the allegedly defamatory rumor—absent statements under oath or otherwise to that effect—seems to me to be no more than speculation. *Id.* at 8. Although Foster may have had a motive to spread the allegedly defamatory statement, it is also possible that others had a similar motive, especially in light of Cummings' apparent unpopularity and questionable performance of her duties at DSH.[3] I am reluctant to conclude that Foster's arguably far-from-unique motive to utter the statement in question—without testimony or other evidence that she in fact did so—sufficiently supports an inference of misconduct to require Foster to stand trial. And I am not

---

[3] That the motives of other co-workers were neither alleged in the complaint nor unearthed during discovery does not help Cummings build her case against Foster. Indeed, it may instead reveal that Cummings aims to pin the rumor on Foster, *her* workplace adversary.

9

at all convinced on the broader point: that motive alone would in the ordinary run of cases be sufficient to support a conclusion that a defendant published a defamatory falsehood.

The Nevada Supreme Court has stated that "circumstantial evidence may be used to prove that [a] defamatory statement was communicated to a third person when evidence is presented regarding the tone in which the defamatory statement was made or the proximity of third parties." *Blanchard v. Circus Casinos*, 127 Nev. 1119, 373 P.3d 896, 2011 WL 4337055, at *2 (Nev. 2011) (unpublished order of affirmance) (internal quotation marks omitted). It has also suggested that a plaintiff might rely on "direct or circumstantial evidence of the communication of the defamatory statement to a third person." *M & R Inv. Co. v. Mandarino*, 103 Nev. 711, 716, 748 P.2d 488, 491 (Nev. 1987). But there was no question in those cases that the defendant *made* the allegedly defamatory statement; the issue in both was instead whether a statement that was admittedly made by a defendant was published to a third party. *Id.*; *Blanchard*, 127 Nev. 1119, 373 P.3d 896, 2011 WL 4337055 at *2. The Nevada Supreme Court has not, to the best of my knowledge, held, stated, or even suggested that a slander per se claim may proceed absent a modicum of direct evidence connecting the defendant to the making of the allegedly defamatory statement.

\* \* \*

10

I have noted that I agree—albeit with some reluctance—with the majority's conclusion that the district court erred by deciding that if Foster made the statements in issue, she enjoyed a privilege to do so. *See Simpson v. Mars, Inc.*, 113 Nev. 188, 191, 929 P.2d 966, 968 (1997) (holding "that publication of defamatory material to anyone other than the person defamed, even to agents, is publication for the purpose of making a prima facie case of defamation"). I take a moment to express my concern as to possible unfortunate consequences of that conclusion.

The Department of Homeland Security has adopted as its own the familiar post-9/11 slogan: "If you see something, say something."[4] The allegedly defamatory statement at issue in this appeal concerned threatened workplace violence by a recently suspended co-worker who may well have harbored a bitter grudge. If the headlines in the news media are to be believed, there is reason to fear that such violence has become alarmingly frequent. On the day that our panel heard argument in this appeal, for example, a former employee of a business in Orlando, Florida reportedly walked into his former workplace and shot and killed

---

[4] *If You See Something, Say Something*, DEP'T OF HOMELAND SECURITY, https://www.dhs.gov/see-something-say-something (last visited July 31, 2017).

11

five employees, and then himself.[5]  Did words of warning precede the Orlando carnage?

I fear that, after our decision today, at least in the context of potential workplace violence, the Department of Homeland Security motto may have to be amended to read:  "If you see something say something—but be warned that if your understanding of what you saw or heard turns out to be false, you must be prepared to spend years defending yourself from a slander suit, and perhaps to suffer a money judgment at the end of the ordeal."[6]  Might that deter someone from reporting a rumored or otherwise-suspected plan to carry out a workplace shooting spree where the plan indeed turns out to be afoot?  I can only hope not.

\* \* \*

---

[5] *See* David Harris et al., *Orlando Workplace Shooting: Former Employee Kills 5, Then Himself*, ORLANDO SENTINEL (June 5, 2017), http://www.orlandosentinel.com/news/orlando-workplace-shooting/os-orlando-workplace-shooting-20170605-story.html; *see also* Christal Hayes & Paul Brinkmann, *Orlando Shooting Is Latest in Growing Trend of Workplace Violence, Expert Says*, ORLANDO SENTINEL (June 5, 2017), http://www.orlandosentinel.com/news/orlando-workplace-shooting/os-orlando-workplace-shooting-violence-uptick-20170605-story.html ("There were 417 homicides at workplaces across the country in 2015, according to the [United States] Bureau of Labor Statistics.").

[6] *Cf.* Learned Hand, *The Deficiencies of Trials to Reach the Heart of the Matter*, *in* ASS'N OF THE BAR OF THE CITY OF NEW YORK, 3 LECTURES ON LEGAL TOPICS 89, 105 (1926) (musing a lawsuit should be "dread[ed] . . . beyond almost anything else short of sickness and death"), *quoted in Simon DeBartolo Grp., L.P. v. The Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 177 (2d Cir. 1999).

Because I can find nothing of substance in the record sufficiently connecting the defendant to utterance of the allegedly defamatory statement at issue, I conclude that the district court was right to dismiss the claim, even if on another basis than it used.  Therefore and to that extent, I respectfully dissent.