Kelley JAMES, Plaintiff,

v.

DEPENDENCY LEGAL GROUP, and Does 1 through 10, inclusive, Defendants.

Case No.: 14–CV–1756–AJB–JMA

United States District Court, S.D. California.

Signed December 2, 2015

Christopher Barnes Barnes, Marcus A. Mancini, Meghan George, Tara Jennifer Licata, Mancini and Associates, Sherman Oaks, CA, for Plaintiff.

Douglas A. Cleary, Law Offices of Douglas A. Cleary, San Diego, CA, for Defendant.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF CLAIMS AND DAMAGES

Hon. Anthony J. Battaglia, United States District Judge

Presently before the Court is Defendant Dependency Legal Group's ("DLG") motion for summary judgment, or, in the alternative, for summary adjudication of claims and damages. (Doc. No. 24.) Plaintiff Kelley James ("James") opposes the motion. (Doc. No. 26.) Pursuant to Civil Local Rule 7.1.d.1, the Court finds the matter suitable for determination on the papers and without oral argument. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** DLG's motion.

#### BACKGROUND

This dispute arises from James's employment with DLG and its treatment of her following her return to work from maternity leave. James was an attorney employed with DLG from 2010 to 2014. (Doc. No. 26–2 at 39; Doc. No. 26–3 at 44.) DLG is a non-profit law firm representing indigent families involved with the juvenile dependency system at each of the state courthouses located throughout San Diego County. (Doc. No. 24–2 ¶¶ 2, 4.) It has a single office located in Mission Valley (the "Office"). (*See* Doc. No. 26–2 at 10, 41.) Candi Mayes ("Mayes") is DLG's Chief Executive Officer and Executive Director, and Brian Blackwood ("Blackwood") is DLG's Chief Operations Officer. (Doc. No. 24–2 ¶¶ 1, 3; Doc. No. 24–3 ¶ 1.)

DLG is comprised of multiple divisions. (Doc. No. 24–2 ¶¶ 5–6.) At all relevant times, James and all other relevant parties were assigned to the Conflict Parent Office ("CPO") Division. (*See id.* ¶¶ 8, 12.) In each of its divisions, DLG employs two levels of attorneys, Associates and Junior Associates. (Doc. No. 26–2 at 6–7.) Associates are more experienced and thus expected to handle more complex cases and a higher volume of cases than Junior Associates. (*Id.*) Associates are accordingly paid more than Junior Associates. (*Id.*) As of October 1, 2013, there were four Associates and ten Junior Associates in CPO. (Doc. No. 24–2 ¶ 12.) At all relevant times, James was an Associate. (Doc. No. 24–3 at 6.)

James left for maternity leave on June 15, 2013. (Doc. No. 26–2 at 40.) At that time, she was assigned to the courthouse located in Kearny Mesa ("Kearny Mesa" or "Kearny Mesa Courthouse"). (*Id.* at 39–40.)

In August or September 2013, Amanda Moreno ("Moreno"), a Junior Associate working at the courthouse located in Vista ("Vista" or "Vista Courthouse"), tendered her resignation. (Doc. No. 24–2 ¶ 10.) On September 24, 2013, while still out on maternity leave, James emailed her supervisor, Robert Gulemi ("Gulemi"). (Doc. No. 26–2 at 2.) James, having heard of Moreno leaving, knew attorneys would likely be moved between courthouses and wanted to inform Gulemi of her thoughts on the matter, including that she "would be devastated to move to Vista . . . ." (*Id.*) On October 1, 2013, Gulemi informed James she would be transferred to Vista. (*Id.* at 4.) This transfer increased her daily round-trip commute by approximately 70 miles and a minimum of two hours. (*See id.* at 9–10.)

Mayes made the decision to transfer James after considering several factors. (Doc. No. 24–2 ¶¶ 11–14.) First, Mayes reviewed the CPO attorneys' caseloads. (*Id.* ¶ 12.) As of October 1, 2013, James carried 52 cases.[1] (*Id.* ¶ 12.) The remaining Associ-

---

1. James disputes the accuracy of this figure. (Doc. No. 26–2 at 63.) She explains that cases

ates carried between 91 and 124 cases. (*Id.*) Moreno carried the second highest caseload with 101 cases. (*Id.*) Second, Mayes considered the makeup and personalities of the teams, and their relationships with the bench officers before whom they appeared. (*Id.* ¶ 13.) Third, she considered the training needs of the new Junior Associate who would inevitably be hired. (*Id.*) Based on these factors, Mayes determined James was the most appropriate attorney to fill Moreno's position, thus putting four of the five largest caseloads in the Associates' hands. (*Id.* ¶ 14.) The new hire, who would be a Junior Associate, would fill James's position in Kearny Mesa. (Doc. No. 26–2 at 7.)

On October 15, 2013, James requested that DLG reconsider its decision to transfer her to Vista and assign her instead to a courthouse closer to the Office. (Doc. No. 26–2 at 9–10.) She made this request because her infant son had been diagnosed with gastrointestinal issues, resulting in poor weight gain. (*Id.* at 9.) She wanted to be close to him should any significant medical issue arise and to breastfeed or provide freshly pumped milk to him during her lunch hour. (*Id.*) She also wanted to be closer to the Office because she was informed that DLG provided accommodations for her to express milk privately there, but not at the Vista Courthouse. (*Id.* at 10.)

Mayes stated she looked to whether she could accommodate James's request, but "ultimately decided that there was no reasonable accommodation in any of the other courtrooms that could be made for [her] that would prevent her from going to Vista." (Doc. No. 24–2 ¶ 17.) However, only eleven minutes after receiving James's email, Blackwood emailed Gulemi, stating, "I will respond to her tomorrow. The an-

swer is NO." (Doc. No. 26–2 at 13.) Blackwood sent this email without requesting documentation from James supporting her need for accommodations, despite this being his typical practice. (Doc. No. 26–3 at 7.) Blackwood's rationale was that "[s]he had just taken all of this time for maternity, and I couldn't find any time available, in my mind." (*Id.* at 8.) DLG also did not consider allowing James to demote to Junior Associate to permit her to remain in Kearny Mesa or to go to a courthouse closer to her son. (*Id.* at 29.)

Blackwood responded to James's request for reconsideration on October 16, 2013, informing her that DLG could not grant her request. (Doc. No. 24–3 at 3 ¶ 3, 5–8; Doc. No. 26–2 at 15–18.) He explained the decision was based on DLG's needs and ability to maintain James as an Associate. (Doc. No. 24–3 at 5.) In response to her concerns regarding travel to Vista, Blackwood explained, "DLG reimburses its employees' travel from the [Office] to their assigned courthouse and back to the [O]ffice. ... This reimbursement policy has been in place since DLG began in 2010." (*Id.* at 6–7.) He further explained she would be provided lactation accommodations at the Office, but no such accommodations were possible in Vista as DLG had no control over the courthouse. (*Id.* at 7.) However, DLG never investigated whether or where she might be able to express milk there. (Doc. No. 26–3 at 39.)

James returned to work on October 28, 2013, reporting to the Vista Courthouse. (*See* Doc. No. 26–2 at 4.) Because DLG did not provide lactation accommodations there, while at the Vista Courthouse, she was required to express milk in a variety of places, including a vacant judge's chambers, her car while parked in the court-

are generally assigned "to the person [who] handles the hearing." (*Id.*) Because she was on maternity leave for the approximately four

months prior to Mayes looking at the caseloads, James argues Mayes's figure artificially depresses her caseload's size. (*Id.*)

house's parking lot or at a park down the street, and the "attorney workroom" in the presence of other attorneys. (Doc. No. 24–2 ¶ 20; Doc. No. 26–2 at 59–62.) Mayes stated James had other options, including driving to the Office after her morning calendar to express milk, and driving back to Vista on days she had an afternoon calendar, 39 miles each way; or, alternatively, driving home after her morning calendar to breastfeed her son or express milk, and driving back to Vista if she had an afternoon calendar, 59 miles each way. (Doc. No. 24–2 ¶ 21; Doc. No. 26–3 at 35–36, 39–40.)

In the mornings, prior to traveling to Vista, James would travel from her home to the Office to gather files and make phone calls while expressing milk. (Doc. No. 26–2 at 41.) However, two days after she returned to work, Gulemi informed her this practice was "frown[ed] upon." (Id. at 44, 46.) He then asked her to sign a special mileage policy and informed her she could not claim reimbursement for her morning trip from the Office to Vista unless she was "doing something significant" in the Office. (Id. at 45–46.)

On January 1, 2014, DLG instituted a new mileage reimbursement policy (the "Policy") requiring its attorneys to report directly to their assigned courthouses for their morning appearances. (Doc. No. 24–2 ¶ 23; Doc. No. 26–2 at 26.) The Policy specifically prohibited DLG's attorneys from stopping by the Office in the morning. (Doc. No. 26–2 at 26) ("Attorneys ma[y] NOT come to [the Office] before traveling to the assigned courthouse.") (emphasis in original). The Policy also made the attorneys' morning commute to their assigned courthouses not subject to reimbursement. (Id.)

On January 28, 2014, James sent Blackwood and Gulemi emails, asking whether she could accept employment as an instructor at California Western School of Law. (Id. at 53.) Blackwood never responded. (Id. at 53–54.) When James complained to Gulemi, he stated, "[W]hat did you expect[? Y]ou're suing them." (Id. at 54.)

James filed the instant action in San Diego Superior Court on May 14, 2014, alleging seven causes of action: disparate treatment; failure to accommodate lactation in violation of California Labor Code section 1031 and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(r); failure to provide reinstatement to the same or a comparable position following maternity leave in violation of California's Pregnancy Disability Leave Law ("PDLL"), the California Family Rights Act ("CFRA"), and the federal Family and Medical Leave Act ("FMLA"); and failure to reimburse business expenses in violation of California Labor Code section 2802. (Doc. No. 1–2.)

DLG removed the case to this Court on July 25, 2014. (Doc. No. 1.) It filed an answer on the same day, denying the complaint's allegations and asserting 33 affirmative defenses. (Doc. No. 1–5.) On August 21, 2015, DLG filed the instant motion for summary judgment. (Doc. No. 24.) James filed a response in opposition on September 21, 2015, (Doc. No. 26), and DLG filed a reply, (Doc. No. 28).

On October 22, 2015, the Court ordered supplemental briefing, concluding the parties failed to address the correct legal frameworks governing James's failure-to-reinstate claims. (Doc. No. 32.) The Court ordered James to file a supplemental pleading to clarify whether her CFRA and FMLA claims were retaliation or interference claims. (Id. at 4–5.) The Court further ordered both parties to address the correct legal frameworks governing claims arising under the PDLL, CFRA, and FMLA. (Id. at 3–6.) James filed her supplemental pleading on October 30, 2015, clarifying she alleges both retaliation and interfer-

ence claims under the CFRA and FMLA.[2] (Doc. No. 33.) DLG filed its supplemental brief on November 6, 2015, (Doc. Nos. 34, 35), and James filed her supplemental brief in opposition on November 13, 2015, (Doc. No. 36).

On November 16, 2015, the Court ordered an additional round of supplemental briefing, requesting that DLG provide the dates on which James's leave under the PDLL, CFRA, and FMLA ended. (Doc. No. 38.) DLG filed its supplemental brief on November 19, 2015, providing no clear answer as to when James's leave under the various statutes began or ended. (*See* Doc. No. 39.) In its briefing, DLG argued James never took leave under the PDLL, and even if she had, it would have ended on October 15, 2013. (*Id.* at 3–6.) DLG further argued her leave under the CFRA ended on October 28, 2013, the date on which she requested it to end. (*Id.* at 6–7.) Finally, DLG argued James's leave under the FMLA ended on September 7, 2013, because "there is no evidence that she was on pregnancy disability leave," and therefore it began to run on June 15, 2013, the first day of her maternity leave. (*Id.* at 7–8.) James responded, arguing she was on leave under the PDLL until she returned to work on October 28, 2013, given that she is entitled under that act to 17 1/3 weeks of disability leave. (Doc. No. 41 at 2–3.) She did not dispute DLG's contention that her leave under the CFRA ended on October 28, 2013. (*Id.* at 3–4.) She conceded her leave under the FMLA ran con-

currently with her leave under the PDLL, so her FMLA leave ended on September 6, 2013. (*Id.* at 3.)

### LEGAL STANDARD

 Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

 A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial. *Id.* at 322–23, 106 S.Ct. 2548. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary

---

2. DLG objects to the form of James's supplemental pleading. (Doc. No. 34 at 2, 6–7.) While an unconventional format, the Court agrees with James that her submission satisfies the Court's order requesting clarification of the types of claims she is pursuing under the CFRA and FMLA. The Court neither specified the format of her pleading nor requested additional allegations on which she predicates those claims. The Court also rejects DLG's position that James "did not address in her [October 30, 2015, filing] the first issue or-

dered by the Court concerning the correct legal framework governing her PDLL claim." (*Id.* at 2.) As that filing was James's supplemental *pleading* and not her supplemental *briefing*, which James was required to file (and did file) on November 13, 2015, the Court's order did not mandate James to address her PDLL claim in that filing. (*See* Doc. No. 32 at 6) (ordering James "to file a supplemental pleading clarifying whether her [CFRA and FMLA claims] are interference or retaliation claims").

judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth facts showing a genuine issue of a disputed fact remains. *Celotex Corp.*, 477 U.S. at 330, 106 S.Ct. 2548. When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## DISCUSSION

### I. Sufficiency of the Complaint

As an initial matter, DLG argues the complaint fails to plead sufficient factual allegations to provide it with notice of James's claims. (*See* Doc. No. 28.) DLG also argues that her opposition is an inappropriate attempt to add factual allegations and new claims to her complaint. (*See id.* at 2–4, 8–9.)

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Plaintiffs must also plead, however, "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The plausibility standard thus demands more than a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Instead, the complaint "must contain allegations of underlying facts sufficient to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

In reviewing the sufficiency of a complaint, courts must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). However, the court need not take legal conclusions as true "merely because they are cast in the form of factual allegations." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)) (internal quotation marks omitted).

"Summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco Prods., Inc. v. Southwall Tech., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006). Accordingly, the complaint must contain "[t]he necessary factual averments . . . with respect to each material element of the underlying legal theory." *Id.*; *see also Trishan Air, Inc. v. Fed. Ins. Co.*, 635 F.3d 422, 435 & n.19 (9th Cir. 2011) (concluding plaintiff's claim "was not properly before the district court" where plaintiff first raised it in opposition to summary judgment).

### A. Disparate Treatment Claim

DLG argues the complaint is fatally flawed because James failed to allege that DLG acted with discriminatory intent or treated similarly situated individuals differently in their employment because of a protected characteristic. (Doc. No. 24–1 at 14; Doc. No. 28 at 5–6.) However, this argument mistakenly conflates a plaintiff's initial burden of proof under the *McDonnell Douglas* framework, discussed *infra*, and the notice pleading standard. *See infra* Discussion Section II. Under *McDonnell Douglas*, the favorable treatment of similarly situated, non-protected class individuals is one element of a plaintiff's prima facie case. *See Villiarimo v. Aloha Island*

*Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002). However, pleading a prima facie case is not the plaintiff's burden in pleading her complaint. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("The prima facie case under *McDonnell Douglas* ... is an evidentiary standard, not a pleading requirement."). Rather, the plaintiff must plead facts sufficient to support her claim to relief. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp.*, 550 U.S. at 570, 127 S.Ct. 1955.

■ Here, James's first claim is for disparate treatment, the elements of which are as follows: (1) the defendant was an employer; (2) the plaintiff was the defendant's employee; (3) the defendant took an adverse employment action against the plaintiff; (4) the plaintiff's protected status was a substantial motivating reason for the adverse employment action; (5) the plaintiff was harmed; and (6) the defendant's adverse employment action was a substantial factor in causing the plaintiff's harm. *Harris v. City of Santa Monica*, 56 Cal.4th 203, 232, 152 Cal.Rptr.3d 392, 294 P.3d 49 (2013); Cal. Civ. Jury Instruction 2500.

■ Reviewing the complaint, the Court concludes James has pled sufficient factual allegations to put DLG on notice of the events giving rise to her disparate treatment claim. DLG employed James as an Associate beginning in July 2010. (Doc. No. 1–2 ¶ 7.) She took maternity leave June 15, 2013, for approximately four months. (*See id.* ¶¶ 8–9.) DLG allegedly took adverse employment actions against her by failing to make reasonable lactation accommodations and failing to return her to the same position she held prior to her leave. (*Id.* ¶¶ 9, 13–15, 18.) James alleges these actions were substantially motivated by her gender or pregnancy; caused her harm, including the loss of a teaching position at California Western School of Law; and were a substantial factor in causing her damages. (*Id.* ¶¶ 19–21.) The Court therefore rejects DLG's position that the complaint does not sufficiently plead the disparate treatment claim.

■ However, the Court agrees that James attempts to introduce evidence beyond the scope of her complaint in an effort to avoid summary judgment. Specifically, she provided evidence that Blackwood instructed DLG management members to not speak to her regarding her reassignment to Vista, (Doc. No. 26–2 at 32; Doc. No. 26–3 at 10); and that he filed a worker's compensation claim on her behalf, without her knowledge or consent, although he has never done so in his approximately twenty years in management with respect to any other employee, (Doc. No. 26–2 at 23–24; Doc. No. 26–3 at 13). James further provides evidence that DLG failed to investigate her complaint lodged with the Equal Employment Opportunity Commission, (Doc. No. 26–3 at 19–20), and that DLG has a pattern of discriminating against female employees who are pregnant or disabled, (*id.* at 51–54, 61–64). Yet James neither alleged anything similar to this evidence in her complaint nor sought leave to amend her complaint following discovery of these facts. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006) (finding the district court did not err in concluding plaintiff "failed to provide adequate notice of" allegations that were "not part of the original complaint" and where plaintiff failed to "amend the complaint to include more specific allegations").[3]

---

3. DLG characterizes these allegations as "new claims." (Doc. No. 28 at 8.) However, they are properly characterized as factual allegations supporting James's disparate treatment claim given that she presented these allegations as such. (*See* Doc. No. 26 at 10–12, 14–15, 22–24.) Either way, Ninth Circuit precedent is clear: neither new factual allegations nor new claims presented in opposition

In sum, the Court rejects DLG's argument that James failed to sufficiently plead her disparate treatment claim. However, the Court agrees with DLG that James has improperly attempted to introduce evidence beyond the scope of her complaint. Accordingly, the Court will not consider any evidence of allegedly discriminatory actions taken against James that were not pled in her complaint when deciding the propriety of DLG's summary judgment motion.

### B. Additional Claims in James's Opposition

■■■ James contends DLG failed to address her claims for retaliation and failure to accommodate a known physical or mental disability. (Doc. No. 26 at 25, 28–30.) DLG argues James has inappropriately attempted to amend her complaint by adding new legal theories through her opposition to summary judgment. (Doc. No. 28 at 8–9.)

Contrary to James's contention, the Court cannot discern where claims for retaliation and failure to accommodate a known disability are pled. The only mention of retaliation in the complaint is a single sentence where James states she filed a "right to sue" notice with the appropriate authorities "[a]s a result of [DLG's] unlawful discrimination and *retaliation* ...." (Doc. No. 1–2 ¶ 16) (emphasis added). Similarly, there are no facts in her complaint that could possibly put DLG on notice of a claim for failure to accommodate a known disability. She simply states she brought "the breastfeeding issue" to DLG's attention, but it denied her request for lactation accommodations. (*Id.* ¶¶ 15, 18, 28.) Nowhere does she state she was suffering from a disability upon returning to work.

The Court is cognizant that a plaintiff does not have all relevant information when she files her complaint. However, if facts surfaced during discovery informing James that she had claims for retaliation and failure to accommodate a known disability, she should have amended her complaint to plead these claims. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000) ("the plaintiffs, who clearly stated ... claims of disparate treatment but sought also to pursue claims of disparate impact, were required either (1) to plead the additional disparate impact theory in their complaints, or (2) to make known during discovery their intention to pursue recovery on the disparate impact theory omitted from their complaints"). Accordingly, because James "raised the[se] claims of liability for the first time at summary judgment," *id.*, the Court concludes James may not pursue claims for retaliation or failure to accommodate a known disability in this action.

### II. James's Disparate Treatment Claim

■■■ James's first claim alleges disparate treatment on the basis of her "gender, pregnancy, and/or physical disability." (Doc. No. 1–2 ¶ 19.) As an initial matter, James did not specify in her complaint whether her claim arises under Title VII or the Fair Employment and Housing Act ("FEHA"). (*See id.* ¶¶ 17–21.) Her opposition suggests the latter. (*See* Doc. No. 26 at 15–16.) Because "California law under the FEHA mirrors federal law under Title VII," the Court will analyze James's first claim under appropriate California state cases dealing with FEHA claims and fed-

---

to summary judgment are properly considered. *See Pickern*, 457 F.3d at 968–69 (holding factual allegations presented in opposition to summary judgment improper); *Coleman v.*

*Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000) (holding claims presented in opposition to summary judgment improper).

eral cases dealing with Title VII claims. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1219 (9th Cir. 1998); *see also Guz v. Bechtel Nat'l Inc.*, 24 Cal.4th 317, 354, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (2000) ("Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own laws."). *Cf. Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 932 (9th Cir. 2002) (construing plaintiff's claim alleged in its complaint in light of plaintiff's clarification in its briefing).

■■■ "Disparate treatment" is intentional discrimination against one or more persons on prohibited grounds. *See Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), enunciated a three-step burden-shifting framework to analyze discrimination claims. *See also Guz*, 24 Cal.4th at 354, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (adopting the *McDonnell Douglas* framework in FEHA discrimination cases). Under this framework, the plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to offer a legitimate, nondiscriminatory basis for the action taken. *Id.* at 802–03, 93 S.Ct. 1817. If the defendant does so, the burden shifts back to the plaintiff to prove the defendant's proffered reason is mere pretext for its action. *Id.* at 804–05, 93 S.Ct. 1817.

### A. Applicability of the *McDonnell Douglas* Framework

James first argues the *McDonnell Douglas* framework does not apply because she has produced direct evidence of discrimination. (Doc. No. 26 at 17.) She asserts the Court must disregard DLG's proffered legitimate business reason and permit the case to go to trial on the merits simply by virtue of having produced direct evidence. (*Id.*)

■■■ "[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (citing *Teamsters v. United States*, 431 U.S. 324, 358 & n.44, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin*, 150 F.3d at 1221 (internal citation and quotation marks omitted). Comments may constitute direct evidence of discriminatory animus. *See Metoyer v. Chassman*, 504 F.3d 919, 937–38 (9th Cir. 2007) (holding bigoted remarks by members of senior management, such as "[t]here are no people of color on senior staff, and it's very unlikely that there will be," to be direct evidence). However, " 'statements by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process itself' " are stray remarks that "do not constitute direct evidence of decisionmakers' 'substantial negative reliance on an illegitimate criterion in reaching their decision.' " *Reid v. Google, Inc.*, 50 Cal.4th 512, 536, 113 Cal.Rptr.3d 327, 235 P.3d 988 (2010) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring)). Rather, stray remarks are circumstantial evidence that can be probative of discriminatory animus and should be considered in conjunction with other circumstantial evidence. *See id.* at 539–41, 113 Cal.Rptr.3d 327, 235 P.3d 988.

■■■ James contends she has presented direct evidence of discriminatory animus in the form of statements that Blackwood

and Mayes made during their depositions. (Doc. No. 26 at 17–19.) While Blackwood and Mayes are decisionmakers at DLG, the comments James relies upon are "unrelated to the decisional process itself." *Reid*, 50 Cal.4th at 536, 113 Cal.Rptr.3d 327, 235 P.3d 988 (quoting *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring)). Rather, these statements were made nearly two years after the relevant events. *Cf. Kelly v. Stamps.com, Inc.*, 135 Cal.App.4th 1088, 1101, 38 Cal.Rptr.3d 240 (2005) (noting CEO's comments that then-seven-months-pregnant plaintiff was "checked out" made *during* the decisional process were direct evidence of discriminatory animus).

More importantly, the evidence James characterizes as direct is more accurately considered circumstantial because it requires an inferential step to establish discriminatory animus. For example, it is not plain on the face of Blackwood's comment that DLG "represents several thousand children [who] are much worse off than [James's] child" that James's gender or pregnancy was a substantial motivating factor in the decision to transfer her to Vista. (Doc. No. 26–3 at 12.) The same can be said of Mayes's comment that James's "personal convenience was not something that I could accommodate based on the needs of [DLG] and the clients." (*Id.* at 25.) *Compare Godwin*, 150 F.3d at 1221 (holding manager's statement that he "did not want to deal with another female after having dealt with" one female manager to be direct evidence), *and Cordova v. State Farm Ins.*, 124 F.3d 1145, 1149 (9th Cir. 1997) (holding employer's reference to Mexican–American employee as a "dumb Mexican" to be direct evidence), *with Noyes v. Kelly Servs.*, 488 F.3d 1163, 1171–72 (9th Cir. 2007) (holding decisionmaker's false statements to other employees that plaintiff "was not interested in the promotion," considered against the backdrop that decisionmaker favored members of the Fellowship of Friends for promotion, to be circumstantial evidence).

 Furthermore, even if the Court were persuaded that James has presented direct evidence, the Court does not agree it must disregard DLG's proffered business reason. Even in cases where the plaintiff produced direct evidence, courts have considered the employer's proffered business reason for its actions. *See, e.g., Kelly*, 135 Cal.App.4th at 1099–1101, 38 Cal.Rptr.3d 240 (noting plaintiff adduced evidence, including direct evidence in the form of CEO's statement that pregnant plaintiff was "checked out" and therefore not to be considered for retention, "that cast doubt on the genuineness of *defendant's explanation for her discharge*") (emphasis added). *McDonnell Douglas* framework or not, "[t]he central issue is and should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus." *Mamou v. Trendwest Resorts, Inc.*, 165 Cal.App.4th 686, 715, 81 Cal.Rptr.3d 406 (2008). Whether the employer has a legitimate business reason for its action is relevant to this inquiry and should accordingly be considered.

The Court therefore concludes that James's evidence of discriminatory animus is properly characterized as circumstantial, thus warranting application of the *McDonnell Douglas* framework.

**B. James's Prima Facie Case**

 The first step of the *McDonnell Douglas* framework requires the plaintiff to establish a prima facie case of discrimination. 411 U.S. at 802–04, 93 S.Ct. 1817. A plaintiff may make this showing by proving that (1) she belongs to a protected class; (2) she was qualified for the job, promotion, or other benefit at issue; (3) she was subject to an adverse employment

action; and (4) similarly situated individuals outside her protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *Id.*; *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004). Alternatively, the plaintiff may establish a prima facie case through direct evidence of discrimination. *U.S. Postal. Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 713–14, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). "The requisite degree of proof necessary to establish a prima facie case for [discrimination claims] on summary judgment is minimal ...." *Wallis*, 26 F.3d at 889.

 Here, James has established a prima facie case.[4] Specifically, she was a pregnant woman who "absolutely did her job," (Doc. No. 26–3 at 48); and she was subjected to adverse employment actions in the form of DLG's failures to make reasonable lactation accommodations for her and to return her to her position at the Kearny Mesa Courthouse, (Doc. No. 26–2 at 4, 50–51, 60–62; Doc. No. 26–3 at 35–36, 39–40).

James also offered evidence giving rise to an inference that DLG's actions were motivated by discriminatory animus. In Blackwood's email to her explaining the reasons behind her transfer, Blackwood stated DLG would provide her with lactation accommodations at the Office. (Doc. No. 26–2 at 17.) He further explained, "DLG reimburses its employees' travel from the [Office] to their assigned courthouse and back to the [Office]." (*Id.* at 16.) Yet two days following her return to work, Gulemi told her it was "frown[ed] upon" for her to go to the Office to pump breast

milk prior to her morning court appearance in Vista, despite the Office being the only place where DLG provided lactation accommodations. (*Id.* at 44.) Approximately two months later, DLG changed its mileage reimbursement policy, which had been in place since DLG's inception, to preclude attorneys from going to the Office before their morning court appearance. (*Id.* at 17, 26.) A reasonable jury could infer from this quick change to the Policy that it was instituted to preclude James from using the Office to express milk in the morning. *See Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011) ("temporal proximity [between the protected action and alleged adverse employment action] can by itself constitute sufficient circumstantial evidence [for] the prima facie case" (citing *Bell v. Clackamas Cnty.*, 341 F.3d 858, 865–66 (9th Cir. 2003))). This inference is supported by evidence of a supervisor stating that "if you're not [James], you don't have anything to worry about" in response to an employee asking for permission to go to the Office before work. (Doc. No. 26–3 at 57.)

Accordingly, the Court concludes James has established a prima facie case of discrimination under the *McDonnell Douglas* framework.

### C. DLG's Legitimate Business Reasons

 Where the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory basis for the action taken. *McDonnell Douglas Corp.*, 411 U.S. at 802–03, 93 S.Ct. 1817. The defendant need only "set forth ... the reasons" for its actions; it is not required to prove "it was

---

4. Like DLG, James confuses her initial burden under *McDonnell Douglas*. (*See* Doc. No. 26 at 16.) She erroneously lists out the elements of her disparate treatment claim as the elements of her prima facie case. (*Id.*) However, the correct elements are those set forth in *McDonnell Douglas*. 411 U.S. at 802–04, 93 S.Ct. 1817; *Fonseca,* 374 F.3d at 847.

actually motivated by the proffered reasons." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). DLG has done that here.

■■■ DLG presents a cogent explanation of its need for an Associate in Vista. (Doc. No. 24–1 at 7–8.) Mayes came to the decision to transfer James after weighing a variety of factors, including the Associates' relative caseloads; the makeup and personalities of the teams, and their relationships with the bench officers before whom they appeared; and the training needs of the new Junior Associate who would be hired to fill James's position in Kearny Mesa. (*See* Doc. No. 24–2 ¶¶ 11–14.) Mayes explained transferring James in lieu of another Associate would result in the least disruption to DLG's clients' representation. (Doc. No. 26–3 at 27–28, 33–34.) Mayes further explained DLG's lactation accommodations were available only at the Office because it could not control the state-owned Vista Courthouse. (Doc. No. 24–2 ¶ 20.) Finally, Mayes explained the change to the Policy was due to DLG's funding "being cut by almost 25%." (*Id.* ¶ 22.) Based on these explanations, the Court concludes DLG has satisfied its burden under *McDonnell Douglas* of offering a legitimate, nondiscriminatory basis for its actions.

### D. James's Evidence that DLG's Reason is Mere Pretext

■■■ Where the defendant offers a legitimate business reason for its action, the burden shifts back to the plaintiff to prove that the proffered reason is mere pretext. *McDonnell Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. 1817. The plaintiff can rebut the defendant's showing through direct or circumstantial evidence. *Godwin*, 150 F.3d at 1221–22. "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Id.* at 1221. Alternatively, the plaintiff may offer "circumstantial evidence that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable." *Id.* at 1222. If rebutting the defendant's showing with circumstantial evidence, the evidence must be "specific and substantial." *Id.* (internal citations and quotation marks omitted).

James first argues she has presented direct evidence to rebut DLG's proffered business reason. (Doc. No. 26 at 17–19.) However, as discussed above, her evidence is properly characterized as circumstantial. *See supra* Discussion Section II.A. Accordingly, her evidence must be "specific and substantial" to rebut DLG's business reason as mere pretext. *Godwin*, 150 F.3d at 1222.

■■■ James next argues she has presented sufficient circumstantial evidence to rebut DLG's proffered business reason.[5] (Doc. No. 26 at 19–21.) With respect to her transfer to Vista, she offers evidence of Blackwood's and Mayes's statements during their depositions, including the following: Blackwood's admission that he "couldn't find any time" in his mind to request documentation supporting James's request for transfer to a different courthouse because "[s]he had just taken all this time for maternity"; and Mayes's characterization of James's need to provide fresh breast milk to her underweight son as an issue of "personal convenience" that could

---

**5.** The only circumstantial evidence the Court will consider is evidence relating to factual allegations contained in James's complaint. (Doc. No. 1–2 ¶¶ 1–21.) All other evidence will

not be considered because James failed to plead relevant factual allegations in her complaint. *See supra* Discussion Section I.A.

not be "accommodate[d] based on the needs of [DLG] and the clients." (Doc. No. 26–3 at 8, 25.) James also offers evidence that Mayes could have transferred another Associate to Vista, but declined to do so "[b]ecause it was not reasonable to disrupt hundreds of clients and cases[,]" (*id.* at 27–28), even though Mayes characterizes caseloads as assigned to the department and not the individual attorney, (*id.* at 28). *See Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003) (stating a plaintiff can prove pretext "by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable" (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1127 (9th Cir. 2000))).

While this evidence is specific, the Court finds that a reasonable jury could not conclude the evidence is substantial enough to rebut DLG's proffered business reason. DLG presents a cogent explanation for the need to transfer an Associate to Vista. Mayes explained she chose James for that position, not because she had taken maternity leave, but in part because Mayes did not want to disrupt "hundreds of clients and cases." (Doc. No. 26–3 at 27–28.) While James makes much of this explanation in light of Mayes's concession that caseloads are assigned to the department and not individual attorneys, Mayes explained that from the standpoint of the clients, their cases would be disrupted if assigned to a different attorney, even if the cases are technically assigned to the departments. (*See id.* at 28.) In other words, Mayes's statements are not "inherently inconsistent" and therefore "unworthy of credence." *Raad*, 323 F.3d at 1194 (quoting *Chuang*, 225 F.3d at 1127). Rather, Mayes has been consistent in her explanation for the need for an Associate in Vista and the decision to transfer James there. (Doc. No. 24–2 ¶¶ 8–17; Doc. No. 26–3 at 25, 27–28, 31–32, 34, 38.) *Cf. Payne v. Norwest Corp.*,

113 F.3d 1079, 1080 (9th Cir. 1997) (holding that a genuine issue of material fact exists where an employer provides "shifting explanations," which a jury could ultimately accept).

 Furthermore, James offers nothing more than her own conclusory statement during her deposition, devoid of any supporting facts, as evidence that DLG has "never ever balanced caseloads with attorneys at any time previously." (Doc. No. 26–2 at 63.) While the Court is cognizant it does not "make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions," *Dominguez–Curry v. Nev. Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005) (quoting *T.W. Elec. Serv. Inc.*, 809 F.2d at 630–31), James's "conclusory, self-serving [statement in deposition], lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact," *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) (citing *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993); *United States v. 1 Parcel of Real Property*, 904 F.2d 487, 492 n.3 (9th Cir. 1990)).

James points to the following exchange during Mayes's deposition to support the proposition that there have been "several instances in which [J]unior [A]ssociates had very large caseloads," contrary to DLG's "contention that the protocol of the company is to have [A]ssociates handl[l]ing the larger caseload[s,]" (Doc. No. 26 at 10):

Q: So even though this document indicates that the protocol of [DLG] is to have [A]ssociates handling the larger caseloads, there's several instances, as in October of 2013, where you have [J]unior [A]ssociates handling very large caseloads?

A: Yes. We have—The top three caseloads went to [A]ssociates .... The only one that was a [J]unior [A]ssociate of

the four highest caseloads was [Moreno], and [ ] James was assigned to that. *That put all four of the highest caseloads in [CPO] into the hands of the [A]ssociates.* (Doc. No. 26–3 at 38) (emphasis added). Clearly, this testimony does not support James's assertion. In fact, it supports the opposite inference, namely, that DLG tried to have the largest caseloads assigned to Associates. James also misrepresents Mayes's statements, arguing Mayes admitted she moves attorneys "based on their needs or desires to move," but was unwilling to do so for James. (Doc. No. 26 at 10.) This is inaccurate. Mayes stated she moves attorneys who have "expressed a desire to move" when she is *already* looking to move attorneys between courthouses. (Doc. No. 26–3 at 32.)

Conclusory assertions unsupported by details or facts, coupled with misrepresentations of innocuous statements, are insufficient to create a genuine issue of material fact. Certainly, "[i]t is not the province of [the Court] to spin such evidence in an employer's favor when evaluating its motion for summary judgment. To the contrary, all inferences must be drawn in favor of the non-moving party." *Chuang*, 225 F.3d at 1129. However, even when giving James all reasonable latitude, the Court simply cannot agree that a reasonable jury could conclude her evidence concerning her transfer to Vista is sufficiently substantial to rebut DLG's proffered business reason. Thus, the Court **GRANTS IN PART** DLG's motion for summary judgment with respect to James's first claim of disparate treatment under the FEHA to the extent her claim is predicated on her transfer to the Vista Courthouse.

■■■ However, that does not end the inquiry. James's evidence also includes the temporal proximity between her return to work and the Policy's implementation, from which it can reasonably be in-

ferred that the Policy was instituted to preclude her from using DLG's lactation accommodations prior to her morning court appearances. *See Dawson*, 630 F.3d at 937 ("temporal proximity [between the protected action and alleged adverse employment actions] can *by itself* constitute sufficient circumstantial evidence ... for purposes of both the prima facie case and the showing of pretext" (citing *Bell v. Clackamas Cnty.*, 341 F.3d 858, 865–66 (9th Cir. 2003)) (emphasis added); *supra* Discussion Section II.B. James further presented evidence that she was unable to take advantage of a teaching opportunity because Blackwood failed to respond to her requests for approval. (Doc. No. 26–2 at 53–54.) When James complained to Gulemi, he stated, "[W]hat did you expect[? Y]ou're suing them." (*Id.* at 54.)

The Court is persuaded that this evidence is specific and substantial enough to preclude summary judgment. A reasonable jury could conclude that the swift change to the Policy, implemented on the heels of James's return to work, is sufficient to rebut DLG's proffered business reason for those actions. This evidence is even more compelling when coupled with her lost teaching opportunity. Accordingly, the Court **DENIES IN PART** DLG's motion for summary judgment with respect to James's first claim of disparate treatment in violation of the FEHA to the extent her claim is predicated on the Policy's implementation and her lost teaching opportunity.

### III. James's Claims Arising from DLG's Alleged Failure to Provide Reasonable Lactation Accommodations

James's second and third claims stem from DLG's alleged failure to provide reasonable lactation accommodations in viola-

tion of California Labor Code section 1031 and the FLSA. (Doc. No. 1–2 ¶¶ 22–31.)

### A. California Labor Code section 1031

James's second claim alleges a violation of California Labor Code section 1031, which requires an employer to "make reasonable efforts to provide the employee with the use of a room or other location, other than a toilet stall, in close proximity to the employee's work area, for the employee to express milk in private." (Doc. No. 1–2 ¶ 23.) DLG argues this claim fails as a matter of law because section 1031 does not provide a private right of action except through the Private Attorney General Act ("PAGA"), compliance with which James did not plead in her complaint. (Doc. No. 24–1 at 14–15.)

■ The PAGA specifies that "any provision of [the Labor Code] that provides for a civil penalty . . . for a violation of this code may . . . be recovered through a civil action brought by an aggrieved employee . . . pursuant to the procedures" set forth in section 2699.3. Cal. Labor Code § 2699. Section 2699.3 in turn provides that an employee may institute a civil action for various violations of the Labor Code only after following certain requirements. *See* Cal. Labor Code § 2699.3. However, section 2699.3 limits its applicability to only those provisions listed in section 2699.5 or "Division 5 (commencing with [s]ection 6300)." *Id.* § 2699.3(a), (b), (c). Notably absent from section 2699.5's list are sections 1031 and 1033. *See id.* § 2699.5. Furthermore, these sections are located in Division 2 (Employment Regulation and Supervision), not Division 5 (Safety in Employment). Accordingly, the Court concludes James was not required to plead compliance with section 2699.3 because it is inapplicable to section 1031.

■ DLG next argues that James "has not sustained her burden of proving that DLG did not make reasonable efforts to provide [her] with use of a room" in compliance with section 1031. (Doc. No. 24 at 15.) However, this argument misconstrues the parties' burdens on summary judgment. The moving party—here, DLG, not James—bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. DLG has failed to meet this burden.

James alleges in her complaint the following: DLG's institution of the Policy forced her to express breast milk in her car in the Vista Courthouse's parking lot or a vacant judge's chambers; and "even while at the [Office, she] was forced to express breast milk in an unlocked room to which at least nine other employees had access, sometimes in the presence of other employees . . . ." (Doc. No. 1–2 ¶¶ 13–14.) DLG takes issue with the latter contention, arguing James "is confused" because "lactating employees are allowed to use their supervisors' offices, and that there is no community breast-feeding room" in the Office. (Doc. No. 24–1 at 14–15; Doc. No. 24–2 ¶ 20.) James's evidence supports DLG's argument that the room referred to in the complaint is likely the "attorney workroom" at the Vista Courthouse. (Doc. No. 26–2 at 60–62.)

This error, however, is not fatal to her claim. It is uncontested that DLG provided lactation accommodations only at the Office. (*See* Doc. No. 24–2 ¶¶ 19–20; Doc. No. 26–2 at 17; Doc. No. 26–3 at 39–40.) It is also uncontested that while at the Vista Courthouse, James was required to express milk in a variety of places, including a vacant judge's chambers, her car while parked in the courthouse's parking lot or at a park down the street, and the "attorney workroom" in the presence of other attorneys. (Doc. No. 24–2 ¶ 20; Doc. No. 26–2 at 59–62.) It is further uncontested

that DLG did not investigate where within the Vista Courthouse James may be able to privately express milk. (Doc. No. 26–3 at 39.) A reasonable jury could conclude that failing to provide lactation accommodations at the Vista Courthouse after making no efforts to ascertain whether it was even possible does not constitute "reasonable efforts." Cal. Labor Code § 1031. A reasonable jury could further conclude, given the frequency of James's court appearances in Vista, that her "work area" was the Vista Courthouse and that providing lactation accommodations only at the Office, 39 miles away, was not "a room or other location . . . in close proximity" within the meaning of section 1031. Accordingly, the Court **DENIES** DLG's motion for summary judgment with respect to James's second claim alleging violation of California Labor Code section 1031.

### B. The Fair Labor Standards Act, 29 U.S.C. § 207(r)

 James' third claim, (Doc. No. 1–2 ¶ 30), asserts that DLG's failure to provide reasonable lactation accommodations also violated the FLSA, which requires an employer to provide "a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk." 29 U.S.C. § 207(r)(1)(B). However, § 213(a) exempts an employer from providing such accommodations to "any employee employed in a bona fide executive, administrative, or *professional* capacity . . . ." *Id.* § 213(a)(1) (emphasis added). A "professional" is one (1) who is paid on a salary or fee basis at a rate not less than $455 per week; and (2) whose "primary duty" is performing work "[r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction . . . ." 29 C.F.R. § 541.300(a).

Here, James has not—and cannot—argue that she is not a "professional" within the meaning of the FLSA exemption. It is uncontroverted that she was employed with DLG as an Associate earning $90,000 per year. (Doc. No. 26–2 at 16.) She therefore falls squarely within the FLSA exemption. Accordingly, the Court **GRANTS** DLG's motion for summary judgment with respect to James's third claim alleging violation of the FLSA.

### IV. James's Claims Arising from Her Transfer to the Vista Courthouse

James's fourth, fifth, and sixth claims are predicated on her transfer to Vista in violation of the PDLL, CFRA, and FMLA. (*See* Doc. No. 1 ¶¶ 35, 40, 44.)

#### A. Violation of the FMLA

 The Court next considers, albeit out of turn, James's sixth claim, in which she alleges her transfer to Vista violated the FMLA. (*See id.* ¶¶ 42–44.) Under the FMLA, an employee is "entitled to a total of 12 workweeks of leave during any 12–month period for . . . the birth of a son or daughter . . . ." 29 U.S.C. § 2612(a)(1). The parties agree that James's leave under the FMLA ran concurrently with her leave under the PDLL. (*See* Doc. No. 39 at 7–8; Doc. No. 41 at 3.) *See also Arrunategui v. ConocoPhillips Co.*, No. CV 09–01008 SJO (MANx), 2010 WL 6064592, at *1 (C.D. Cal. Jan. 26, 2010) ("Taking leave under the FMLA . . . can run concurrently with paid accrued leave or paid disability leave." (citing 29 C.F.R. §§ 825.207(d)(1), 825.220(c); 29 U.S.C. § 2612(d)(2))).

 Upon return from leave, an employee is entitled to reinstatement to the same or an equivalent position to the one she held prior to taking leave. 29 U.S.C. § 2614(a)(1). "To maintain a cause of action under the FMLA, however, [the p]laintiff must show that she was still pro-

tected by the 12–week leave period mandated by the FMLA." *Farina v. Compuware Corp.*, 256 F.Supp.2d 1033, 1054 (D. Ariz. 2003). Here, James concedes that her "12 weeks of FMLA leave expired on *September 6, 2013.*" (Doc. No. 41 at 3) (emphasis in original).

The Court notes that James calculated this date from when her maternity leave first began on June 17, 2013. (*Id.*) However, this calculation is likely incorrect. 29 C.F.R. § 825.120 explains that "FMLA leave to be with [a] healthy newborn child (*i.e.,* bonding time) ... begin[s] *on the date of birth*" (emphasis added). James gave birth on July 9, 2013. (Doc. No. 39–2 at 2 ¶ 5, 8.) However, even calculating the 12–week FMLA leave period from her son's birthdate, her FMLA leave would have expired on September 30, 2013. At any rate, based on either her admission or the Court's calculation, the Court concludes that no reasonable jury could find James was protected by the FMLA when she returned to work on October 28, 2013. The Court therefore **GRANTS** DLG's motion for summary judgment with respect to James's sixth claim alleging violation of the FMLA.

## B. Violation of the PDLL

█ In her fourth claim, James contends her transfer to Vista violated her PDLL rights. (Doc. No. 1–2 ¶¶ 32–36.) Under the PDLL, an employee is entitled to return to the same or a comparable position to the one she held prior to taking pregnancy disability leave unless the employer can prove, by a preponderance of the evidence, it is exempt from doing so under California Code of Regulations section 11043(c). *See* Cal. Code Regs. tit. 2, § 11043(a). DLG argues it is entitled to judgment as a matter of law on this claim because the CFRA governs James's claim pursuant to California Code of Regulations section 11043(e), which provides that where an employee takes both pregnancy

disability leave and CFRA leave, "the employee's right to reinstatement to her job is governed by CFRA and not section 11043(c)(1) and (c)(2), above. Under CFRA, an employer may reinstate an employee either to her same or a comparable position." (Doc. No. 34 at 5–6.)

While the Court agrees the CFRA alone would govern if DLG provided clear evidence of the dates on which James's various leaves ended, DLG's evidence is far from that. In the second round of briefing, the Court asked for the dates on which James's leave under the PDLL, CFRA, and FMLA ended. (Doc. No. 38.) Had DLG kept thorough employment records, the answers to these questions would have taken no more than a single page. Instead, DLG submitted a total of 38 pages, which makes clear to the Court that it is anything *but* clear what statutes govern James's leave.

DLG argues that James was *never* disabled, despite acknowledging that she gave birth to her son via cesarean section. (Doc. No. 39 at 2–6.) This argument carries no clout, as even the Supreme Court has acknowledged that the typical "period of physical disability due to pregnancy and childbirth" is four to eight weeks. *Nev. Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 731, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003). 29 C.F.R. § 825.115 further illustrates why DLG's position is unsound, defining a "serious health condition" entitling a woman to family medical leave as including "continuing treatment by a health care provider" for "[a]ny period of incapacity due to pregnancy, or for prenatal care."

James argues that because her physician stated she "would be unable to perform work of any kind between" June 14, 2013, and October 28, 2013, she was disabled and therefore covered by the PDLL. (Doc. No. 41 at 2–3.) However, even reviewing the

evidence in the light most favorable to James, the Court cannot ignore that this time period is comprised of 19 weeks and 3 days, or 37% of a year. Yet the PDLL only entitles an employee to "up to four months" of leave. Cal. Code Regs. tit. 2, § 11042(a). "A 'four month leave' means time off for the number of days or hours the employee would normally work within four calendar months (one-third of a year or 17 1/3 weeks)." *Id.* § 11402(a)(1).

Given that James was only entitled to up to 17 1/3 weeks of disability leave under the PDLL, and she was on leave in excess of 19 weeks, no reasonable jury could find her covered by the PDLL when she returned to work on October 28, 2013. The Court therefore **GRANTS** DLG's motion for summary judgment with respect to James's fourth claim alleging violation of the PDLL.

## C. Violation of the CFRA

In her fifth claim, James contends her transfer to Vista violated her rights under the CFRA. (*See* Doc. No. 1 ¶¶ 37–44.) The CFRA and FMLA provide similar protections; accordingly, "courts use language from [these acts] interchangeably." *Richey v. AutoNation, Inc.*, 60 Cal.4th 909, 919, 182 Cal.Rptr.3d 644, 341 P.3d 438 (2015) (internal citations omitted). The Court will therefore consider James's fifth claim under the statutes and regulations providing definition to both acts, as well as case law analyzing both the CFRA and FMLA. *See Liu v. Amway Corp.*, 347 F.3d 1125, 1132 n.4 (9th Cir. 2003) (considering CFRA and FMLA claims together because the "CFRA adopts the language of the FMLA and California state courts have held the same standards apply").

Under the CFRA, there are two types of claims a plaintiff may allege: a retaliation claim and an interference claim. *See* Cal. Code Regs. tit. 2, § 11094(a), (b); *Sanders v. City of New-

port*, 657 F.3d 772, 776–81 (9th Cir. 2011). A retaliation claim arises when an employer "discriminat[es] or retaliat[es] against an employee or prospective employee for having exercised or attempted to exercise CFRA rights . . . ." Cal. Code Regs. tit. 2, § 11094(b). An interference claim arises when an employer "interfere[s] with, restrain[s], or den[ies] the exercise of rights provided by CFRA." *Id.* § 11094(a). Here, James alleges both retaliation and interference claims. (*See* Doc. No. 33.)

### 1. Retaliation Claim

To establish a retaliation claim, a plaintiff must plead and prove that an adverse employment action taken against her "was prompted by the fact that [she] took [family medical] leave to which [she] was entitled under" the CFRA. *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998). Accordingly, "the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Id.* Because retaliation claims are analogous to discrimination claims brought under Title VII and the FEHA, "when there is no direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies . . . ." *Id.*

As DLG points out, James's fifth claim, as stated in her complaint, is predicated solely on her transfer to Vista, which she alleges violated the CFRA for failing to return her to the same or a comparable position. (Doc. No. 34 at 7.) She simply asserts that upon her return "from maternity leave, on or about October 28, 2013, [DLG] transferred [her] from [the Kearny Mesa Courthouse] to the Vista [Courthouse.]" (Doc. No. 1–2 ¶¶ 35, 40.) While the fifth claim incorporates paragraphs 1 through 16, there is only a single reference to "retaliation" contained in those para-

graphs: "As a result of [DLG's] unlawful discrimination and *retaliation*, . . . [James] timely caused to be filed and received a 'right to sue' notice . . . ." (*Id.* ¶ 16.) As discussed above, James's complaint is wholly deficient in any factual allegations to support the claim that DLG transferred her to Vista in retaliation for her taking maternity leave. *See supra* Discussion Section I.B.

But even if she sufficiently pleaded retaliation claims, her evidence is insufficient, as a matter of law, to rebut DLG's proffered business reason for her transfer to Vista. As the Court discussed above with respect to her disparate treatment claim, James simply misrepresents innocent statements made by Mayes during her deposition in an attempt to rebut DLG's proffered business reason for her transfer. *See supra* Discussion Section II.D. Like that claim, James's retaliation claim under the CFRA must fail. For these reasons, the Court **GRANTS** DLG's motion for summary judgment with respect to James's fifth claim alleging violation of the CFRA to the extent she alleges a retaliation claim.

### 2. Interference Claim

■ Interference claims are more straightforward. Because the employer's subjective motive is irrelevant, *see Hodgens*, 144 F.3d at 159, the standard by which the district court must assess a plaintiff's interference claim "derive[s] from the applicable statute and regulation," *Lew v. Superior Court of Cal.*, No. C 06-03098 CRB, 2008 WL 728895, at *10 (N.D. Cal. Mar. 17, 2008) (citing *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124–25 (9th Cir. 2001)). The CFRA provides two substantive rights to employees: (1) the right to take up to twelve weeks of leave for the purpose of, *inter alia*, the birth of a child, Cal. Govt. Code § 12945.2(a), (c)(3)(A); and (2) the right to be restored to the same or a comparable

position held prior to taking CFRA–protected leave upon return, *see* Cal. Code Regs. tit. 2, § 11089(a). Here, only the latter right is at issue.

In order to comply with the CFRA, an employer must guarantee to an employee taking family medical leave "employment in the same or a comparable position" upon return from leave. Cal. Govt. Code § 12945.2(a). "An employee is entitled to such reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence." 29 C.F.R. § 825.214.

#### a. Whether James was Reinstated to a Comparable Position

■ The parties do not dispute that James was not reinstated to the same position. Accordingly, the first issue the Court must assess is whether she was reinstated to a comparable position. If the Associate position in Vista was comparable to the one in Kearny Mesa, then DLG did not, as a matter of law, violate the CFRA. *See* Cal. Govt. Code § 12945.2(a) (entitling employee to reinstatement to the same *or* an equivalent position); Cal. Code Regs. tit. 2, § 11089(a) (same).

A position is comparable to the one held prior to family medical leave if it is "virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." 29 C.F.R. § 825.215(a). "Equivalent terms and conditions of employment" include reinstatement to "the same or a geographically proximate worksite (*i.e.*, one that does not involve a significant increase in commuting time or distance) from where the employee had previously been employed." *Id.* § 825.215(e)(1); *see also* Cal. Govt. Code

§ 12945.2(c)(4) (stating a comparable position must be able to be "performed at the same or similar geographic location as the position held prior to the leave").

Predictably, DLG argues "that the Vista Courthouse was a 'geographically proximate worksite' since all DLG employees were told that they could be reassigned at anytime to any courthouse, and Vista was still within San Diego County." (Doc. No. 34 at 8.) James argues the contrary. (Doc. No. 36 at 10.)

As an initial matter, the Court notes DLG takes a position in its supplemental briefing seemingly at odds with the position it took in its summary judgment motion. In the latter, DLG argued James "could not be reinstated to the 'same position' nor to a 'comparable position' at the Kearney Mesa [C]ourthouse because *there was no comparable position open.*" (Doc. No. 24 at 18) (emphasis added). In order words, DLG argued it was justified in not reinstating her to the same or a comparable position, essentially conceding that the position to which she was reinstated was not comparable to the one she held prior to taking maternity leave.

Even if DLG's positions are consistent, the Court concludes there exists a genuine issue of material fact as to whether Kearny Mesa and Vista are geographically proximate. While the two cities are both located in San Diego County, a reasonable jury could conclude the cities do not constitute the "same or proximate" worksite considering that (1) the Vista Courthouse is 39 miles away from the Office compared to Kearny Mesa's two-mile distance, (Doc. No. 26–2 at 9); and (2) James's transfer added two to three hours to her daily commute, (*id.* at 9–10). Certainly, a reasonable jury could find that the addition of 70 miles and two hours to one's daily commute involves a "significant increase in commuting time or distance." 29 C.F.R. § 825.215(e)(1). The Court therefore con-

cludes that a genuine issue of material fact exists as to whether James was reinstated to a comparable position.

## B. Whether DLG was Justified in Failing to Return James to the Same or a Comparable Position

Under an interference claim, "evidence that an employer failed to reinstate an employee who was out on [CFRA] leave to her original (or equivalent) position establishes a prima facie denial of the employee's [CFRA] rights." *Sanders*, 657 F.3d at 778 (citing 29 C.F.R. § 825.220(b)). Of course, this right to reinstatement "is not without limits." *Id.* "An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the CFRA leave period." Cal. Code Regs. tit. 2, § 11089(d).

DLG states it was justified in refusing to reinstate James to the same or a comparable position at the Kearny Mesa Courthouse because that position no longer existed. (Doc. No. 34 at 3–5.) DLG explains it eliminated the Associate position in Kearny Mesa and replaced it with a Junior Associate position. (*Id.* at 3–4.) However, the Court cannot conclude as a matter of law that the same or a comparable position was not available. DLG presents evidence of the need for an Associate in Vista, namely, that Moreno tendered her resignation, leaving behind a caseload of 101 cases. (Doc. No. 24–2 ¶ 12.) Because Associates are more experienced and paid a higher salary, Mayes determined an Associate was needed to handle that caseload. (Doc. No. 24–3 at 6; Doc. No. 26–2 at 6–7.) Furthermore, because James's caseload as of October 1, 2013, was only 52 cases, DLG concluded her caseload was insufficient to support an Associate position. (*See* Doc. No. 26–2 at 7.) DLG argues that based on this explanation, James's Associate posi-

tion in Kearny Mesa was "eliminated." (Doc. No. 24–1 at 18.)

However, it does not automatically follow from this explanation that the position was "eliminated" as opposed to James being "replaced." The court in *Kelly v. Stamps.com, Inc.*, 135 Cal.App.4th 1088, 38 Cal.Rptr.3d 240 (2005), dealt with an analogous situation. There, the defendant's management decided the company's cash flow required a reduction in workforce. *Id.* at 1092, 38 Cal.Rptr.3d 240. To accomplish this, management consolidated several departments, which included terminating the plaintiff, who was then seven months pregnant and preparing for maternity leave. *Id.* at 1092–93, 38 Cal.Rptr.3d 240. The defendant hired an outside consultant who assumed the plaintiff's title and performed many, but not all, of the plaintiff's functions. *Id.* at 1100, 38 Cal.Rptr.3d 240. While the defendant's CEO informed the plaintiff she was being discharged "because her position had been eliminated," the court concluded a triable issue existed regarding whether this claim was accurate. *Id.* at 1099–1100, 38 Cal.Rptr.3d 240. The court stated that "evidence that [one or more functions were discontinued] *would not establish that [the] plaintiff's position was eliminated, as opposed to her having been replaced.*" *Id.* at 1100, 38 Cal.Rptr.3d 240 (emphasis added) (internal citation omitted).

Like in *Kelly*, a reasonable jury here could conclude that James's position in Kearny Mesa was not "eliminated," and thus her same position was available. Similarly, a reasonable jury could conclude that eliminating the Associate position in Kearny Mesa to simply replace it with a Junior Associate position is equivalent to "fill[ing] the position with] another employee," thus requiring DLG to reinstate James to the same position at the Kearny Mesa Courthouse or an equivalent one. *See* Cal. Code Regs. tit. 2, § 11089(d)(1) (stating the em-

ployer does not meet its burden of proving the employee "would not otherwise have been employed on the requested reinstatement date" if "the employee has been *replaced* or his or her position has been *restructured* to accommodate the employee's absence") (emphasis added); 29 C.F.R. § 825.216(a)(2) ("If a shift has been eliminated, ... an employee would not be entitled to return to work that shift ... upon restoration. However, if a position on, for example, the night shift has been *filled* by another employee, *the employee is entitled to return to the same shift on which employed before taking FMLA leave.*") (emphasis added).

Furthermore, the Court is not convinced that no genuine issue of material fact exists with respect to whether James would have been the Associate chosen for transfer had she not taken maternity leave. *See* Cal. Code Regs. tit. 2, § 11089(d) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment *than if the employee had been continuously employed during the CFRA leave period.*") (emphasis added). According to Mayes, James was chosen for transfer based in part on her carrying one of the smallest caseloads. (Doc. No. 24–2 ¶ 12.) Yet, a reasonable jury could conclude, as James explains, that this statistic was skewed because she had not been assigned any new cases in the preceding months due to being on maternity leave. (Doc. No. 26–2 at 63.) Mayes further justified the decision to transfer James in lieu of another Associate because it would have been "inefficient" to disrupt three courtrooms instead of just two. (Doc. No. 26–3 at 27–28, 33–34.) But if James had not taken maternity leave, transferring another Associate would have involved disrupting only two courtrooms. While Mayes explained she took other factors into consideration, she did not express any concerns that James could not, for

example, work well with other attorneys or bench officers based on her personality. Accordingly, a reasonable jury could conclude that had James been continuously at work, she would not have been the Associate chosen for transfer to Vista, *i.e.*, she would have remained in the same or a comparable position.

Based on the foregoing, the Court **DENIES** DLG's motion for summary judgment with respect to James's fifth claim alleging violation of the CFRA.

## V. James's Claim Arising from DLG's Alleged Failure to Reimburse Her for Mileage Undertaken in Performance of Her Duties

James's seventh claim arises from DLG's alleged failure to reimburse her for her morning commute to the Vista Courthouse following the Policy's institution. (Doc. No. 1–2 ¶¶ 45–50.) California Labor Code section 2802(a) requires employers to reimburse employees for their "necessary expenditures or losses" incurred "in direct consequence of the discharge of" their duties. The purpose this section is "to prevent employers from passing their operating expenses on to their employees." *Gattuso v. Harte–Hanks Shoppers, Inc.*, 42 Cal.4th 554, 562, 67 Cal.Rptr.3d 468, 169 P.3d 889 (2007). The duty to reimburse under section 2802 is triggered when "the employer either knows or has reason to know that the employee has incurred a reimbursable expense." *Cortes v. Market Connect Grp., Inc.*, No. 14CV784-LAB (DHB), 2015 WL 5772857, at *8 (S.D. Cal. Sept. 30, 2015) (quoting *Stuart v. RadioShack Corp.*, 641 F.Supp.2d 901, 903 (N.D. Cal. 2009)). This duty, however, extends only to those expenses that are "necessary," which turns in part on the reasonableness of an employee's transportation choices. *Gattuso*, 42 Cal.4th at 568, 67 Cal.Rptr.3d 468, 169 P.3d 889 (citing *Grissom v. Vons Cos.*, 1

Cal.App.4th 52, 58, 1 Cal.Rptr.2d 808 (1991)).

Relying on the California Supreme Court's decision in *Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 578, 94 Cal.Rptr.2d 3, 995 P.2d 139 (2000), DLG argues the dispositive inquiry for assessing whether an employee is entitled to reimbursement is whether the employee is subject to the employer's control. (Doc. No. 24–1 at 22–23.) However, *Morillion* is not instructive here because that case has nothing to do with Labor Code section 2802. Rather, *Morillion* construes the meaning of Wage Order No. 14–80, which is applicable only to those employed "in an agricultural occupation." *Morillion*, 22 Cal.4th at 581, 94 Cal.Rptr.2d 3, 995 P.2d 139. The opinion turns on the precise language used in Wage Order No. 14–80, none of which appears in section 2802. *Compare* Cal. Code Regs. tit. 8, § 11140 (requiring certain minimum wages be paid to all agricultural workers for "hours worked"), *and* Cal. Labor Code § 2802 (requiring employers to indemnify employees for "necessary expenditures and losses" in "direct consequence" of her duties for the employer). Accordingly, the relevant inquiry under section 2802 is not whether the employee was "subject to the control of the employer" at the time the expenditures were incurred, *Morillion*, 22 Cal.4th at 578, 94 Cal.Rptr.2d 3, 995 P.2d 139, but rather whether the employer "kn[ew] or ha[d] reason to know that the employee has incurred a reimbursable expense," *Cortes*, 2015 WL 5772857, at *8 (quoting *Stuart*, 641 F.Supp.2d at 903).

Here, there is a genuine issue of material fact whether the Policy was an impermissible attempt to pass DLG's operating costs onto its attorneys. As the California Supreme Court noted in *Gattuso*, "[I]f an employer requires an employee to travel on company business, the employer

*must* reimburse the employee for the cost of that travel under [s]ection 2802." 42 Cal.4th at 562, 67 Cal.Rptr.3d 468, 169 P.3d 889 (emphasis added) (internal citation and quotation marks omitted); *see also* Cal. Labor Code § 2804 (voiding any agreement between employer and employee that attempts to waive the employee's rights to full expense reimbursement under section 2802). Quoting the Labor Commissioner's revision to Interpretive Bulletin No. 84–7, the California Supreme Court continued: "[A]n employer who requires an employee to furnish his/her own car or truck to be used in the course of employment would be obligated to reimburse the employee for the costs necessarily incurred by the employee in using the car or truck in the course of employment." *Gattuso*, 42 Cal.4th at 563–64, 67 Cal.Rptr.3d 468, 169 P.3d 889. It is undisputed that DLG has a single office located in Mission Valley from which it provides juvenile dependency representation at the five courthouses throughout San Diego County. (Doc. No. 24–2 ¶¶ 2, 4; Doc. No. 26–2 at 41.) DLG does not dispute that James used her personal vehicle to reach her assigned courthouse or that it knew she was incurring reimbursable travel expenses through the use of her vehicle to travel to Vista. (*See* Doc. No. 26–2 at 34) (noting James had "submit[ed] mileage for the full month of November" prior to the Policy's implementation). Based on these facts and the California Supreme Court's unequivocal statements concerning employee travel, a reasonable jury could conclude DLG is required under section 2802 to reimburse its attorneys' travel from the Office to the courthouses.

Accordingly, the Court **DENIES** DLG's motion for summary judgment with respect to James's seventh claim alleging violation of California Labor Code section 2802.

## VI. James's Prayer for Punitive Damages

DLG's final argument is that James's prayer for punitive damages must be dismissed as a matter of law. (Doc. No. 24–1 at 23–24.) Specifically, DLG relies on California state appellate opinions for the proposition that allegations of malice must be pled with specificity. (*Id.* at 23.) Not so.

■■■ It is well established that federal courts sitting in diversity must apply state substantive law and federal procedural rules. *See Computer Economics, Inc. v. Gartner Grp., Inc.*, 50 F.Supp.2d 980, 986 (S.D. Cal. 1999) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). Where state law directly conflicts with applicable provisions of the Federal Rules of Civil Procedure, federal courts must apply the Federal Rules, not state law. *Id.* (citing *Hanna v. Plumer*, 380 U.S. 460, 471, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965)).

Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief[,] and ... a demand for the relief sought ...." Rule 9(b) further provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see also Walling v. Beverly Enters.*, 476 F.2d 393, 397 (9th Cir. 1973) (stating Rule 9(b) does not "require any particularity in connection with an averment of intent, knowledge or condition of the mind"); *Clark v. Allstate Ins. Co.*, 106 F.Supp.2d 1016, 1018–20 (S.D. Cal. 2000) (applying federal law where California case law and California Civil Code section 3294 irreconcilably conflicted with Federal Rules of Civil Procedure 8 and 9).

■ James's prayer for punitive damages is predicated on DLG's "intentional[ ] and malicious[ ]" institution of the Policy and failure to provide reasonable lactation

accommodations. (Doc. No. 1–2 ¶¶ 12, 15.) As discussed above, James has presented substantial and specific evidence that DLG's proffered business reasons for these actions are mere pretext for discriminatory animus. *See supra* Discussion Section II.D. *Cf. Clark*, 106 F.Supp.2d at 1020 n.4 (noting a punitive damages prayer may fail on summary judgment if the plaintiff cannot substantiate her allegations with probative evidence (citing *Maddux v. Phila. Life Ins. Co.*, 77 F.Supp.2d 1123, 1133–34 (S.D. Cal. 1999))). Because the Federal Rules of Civil Procedure do not require that allegations of malice and intent be pleaded with particularity, the Court concludes James's complaint is pled in compliance with federal law and therefore rejects DLG's contention that the complaint's alleged insufficiency is a basis for striking the prayer for punitive damages. Accordingly, the Court **DENIES** DLG's motion for summary judgment as to the prayer for punitive damages.

## CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART** Defendant Dependency Legal Group's motion for summary judgment with respect to Plaintiff Kelley James's first claim for disparate treatment in violation of the FEHA to the extent it is predicated on James's transfer to the Vista Courthouse, her third claim for failure to provide lactation accommodations in violation of 29 U.S.C. § 207(r), her fourth claim alleging violation of the PDLL, and her sixth claim alleging violation of the FMLA. The Court **DENIES IN PART** DLG's motion for summary judgment with respect to all other claims and the punitive damages prayer.

IT IS SO ORDERED.